**GUTRIDE SAFIER LLP**
SETH A. SAFIER (SBN 197427)
MARIE A. MCCRARY (SBN 262670)
ANTHONY PATEK (SBN 228964)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469
seth@gutridesafier.com
marie@gutridesafier.com
anthony@gutridesafier.com

KALI BACKER (SBN 342492)
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469
kali@gutridesafier.com

Attorneys for Plaintiffs

**WOOL TRIAL LAW LLC**
DAVID J. WOOL (SBN 324124)
1001 Bannock Street, #410
Denver, CO 80204
Telephone: (720) 509-9101
david@wooltriallaw.com

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT KOLLER, TIM FERGUSON, RUBY CORNEJO and JOHN LYSEK, individually, and on behalf of the general public and those similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>MONSANTO COMPANY; BAYER CROPSCIENCE LP; THE SCOTTS COMPANY LLC; and SEAMLESS CONTROL LLC.,<br><br>                              Defendants. | CASE NO. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE MAGNUSSON-MOSS WARRANTY ACT; VIOLATIONS OF THE SONG-BEVERLY CONSUMER WARRANTY ACT; BREACH OF EXPRESS AND IMPLIED WARRANTIES; VIOLATIONS OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUDULENT CONCEALMENT; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.     Scott Koller, Tim Ferguson, Ruby Cornejo, and John Lysek (collectively, "Plaintiffs") bring this Class Action Complaint against Defendants Monsanto Company ("Monsanto"), Bayer CropScience LP ("Bayer CropScience"), The Scotts Company LLC ("Scotts"), and Seamless Control LLC ("Seamless Control") (collectively "Defendants"), on behalf of themselves and those similarly situated, for violations of Magnusson-Moss Warranty Act, violations of the Song-Beverly Consumer Warranty Act, breach of express and implied warranties, fraud, false advertising, unfair business practices, violations of the Consumers Legal Remedies Act of California, and unjust enrichment. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.     Defendants manufacture, market and/or distribute glyphosate-based herbicides which are designed to kill weeds and primarily sold under the brand name "Roundup". Roundup consists of a family of various products, most of which are glyphosate-based herbicides, with different formulations and different amounts of glyphosate. Some versions have around 2% glyphosate. But Monsanto and Bayer CropScience also manufacture super concentrated formulations with significantly higher amounts of glyphosate ranging from 41% to as much as 73.3% of glyphosate. This case relates to Defendants' concentrated herbicides consisting of more than 40% glyphosate (the "Products"[1]).

3.     The amount of glyphosate in a pesticide matters.[2] N-Nitrosoglyphosate ("NNG") is an impurity inherent to glyphosate. As a result, increasing glyphosate increases the NNG impurity as well. Impurities are "not intentional additives of the pesticide product"; rather, they are "chemical compounds formed, during synthesis of the active ingredient, or during formulation or storage." 45 Fed. Reg. 42855.

4.     NNG belongs to a class of chemicals called nitrosamines. Nitrosamines are so dangerous that The Environmental Protection Agency ("EPA") **presumes** them to be carcinogenic

---

[1] This includes all of Defendants' herbicides with over 40% of glyphosate, regardless of whether they are sold under the Roundup brand name. The Products include, but are not limited to, the Products listed on Exhibit 1.

[2] An herbicide is a type of pesticide under 7 U.S.C. § 136(u)(2).

when they occur at certain levels. EPA's review of nitrosamines determined that 80% of the nitrosamines tested are carcinogenic. *See* 45 Fed. Reg. 42855.

5.      Due to acute safety concerns with nitrosamines, EPA sets a hard limit of 1 part per million ("ppm") of NNG in pesticides, including glyphosate products.

6.      The amount of NNG in a glyphosate product, however, does not remain static. It grows over time.

7.      Glyphosate, by its nature, is a highly reactive and unstable chemical in the presence of nitrites. Any time glyphosate is exposed to nitrites, which are prevalent in everyday environments such as city air, exhaust from cars, and, even in water, glyphosate degrades into NNG. As Monsanto's own former registration manager for glyphosate put it, the degradation reaction is "fast and complete" and occurs "early." *See* Deposition of Stephen Wratten in *Evans v. Monsanto Co.*, No. 1722-CC01372-01, Cir. Ct. of Cty. of St. Louis Cty., Sept. 17, 2021 ("Wratten Tr."), 135:14-18. And, the degradation of glyphosate into NNG occurs regardless of whether the glyphosate is pure or mixed into a formulated end product.

8.      Because NNG is an impurity inherent to glyphosate, increasing the concentration of glyphosate within a product necessarily increases the amount of NNG in the product too. Thus, when a product has 73.3% glyphosate, as opposed to 2% glyphosate, the concentrated product will have far more NNG.

9.      At least as early as 1997, Monsanto had evidence of serious problems with NNG levels during manufacture. Monsanto's internal testing revealed levels as high as **8 ppm** in a glyphosate-based product that was stored in warehouse-like conditions for just 18 months. Later on, in the early 2000s, Monsanto discovered high levels of NNG in whole bags of glyphosate. It hypothesized that the elevated NNG was due to the exhaust from the tractors that were driven near its products. Yet, Monsanto never reported either incident to EPA.

10.     Monsanto knew that glyphosate's reactivity with nitrites meant that NNG would continue to form in the Products post-manufacture. Most importantly, Monsanto knew that, no matter what efforts it took to control the level of NNG in the Products at manufacture—e.g., testing the water that goes into the Products—it could not control NNG levels once the Products

CLASS ACTION COMPLAINT

left the factory. Monsanto knew that simply opening a Product can cause NNG to form if nitrites are in the air. This easily occurs anywhere car exhaust is present, as in consumers' garages, in the presence of smog or near mowers, weed whackers, and other common lawn care equipment. ***Even adding water***—which is necessary to use the Products since they are concentrated formulations—can cause NNG to form because nitrites are frequently present in water. Every exposure to nitrites creates more NNG. Other factors common to consumer use and storage of the Products increase NNG. Heat is one example. Long storage periods also exacerbate glyphosate degradation and NNG production, often rapidly.

11.     In 2004, Monsanto witnessed first-hand just how high NNG can get in its glyphosate-based products. After discovering NNG levels of over 1 ppm in almost all of the productions lots for one of its Products, QuikPRO, Monsanto conducted a study to understand NNG formation. The study confirmed that NNG formation cannot be controlled in the presence of nitrites and that the chemical Monsanto uses to try to control NNG, sodium sulfite, is ineffective at keeping NNG below 1 ppm. It also revealed that surfactants, which are found in the Products, can increase NNG formation upon exposure to nitrites. Not only did the study show that the Products could develop levels of NNG in excess of EPA's regulatory limit, it revealed that ***NNG can exceed an eye-popping 80 ppm,*** more than 80 times EPA's regulatory limit.

12.     EPA knows nothing about the study, or any of the other incidents in which Monsanto found NNG levels over 1 ppm in its glyphosate-based products, according to EPA's own statements.

13.     Moreover, the EPA has a regulatory process for dealing with impurities that can develop over time: the expiration date. The EPA allows manufacturers to restrict the time to which the certified limit on impurities in a product (like NNG) will apply. If the manufacturer states that use of the product is prohibited after a certain date, the limitation on impurities will apply only through that date. *See* 40 C.F.R. § 158.350. If there is no such date, then the regulatory limits apply until the consumer finishes using the product, whenever that may occur. *Id.* Because Monsanto, Bayer CropScience, and Seamless Control never put an expiration date on the Products' labels, the EPA regulatory limit of 1 ppm of NNG has always applied from the

time of manufacture until the consumer actually uses the Product, even if that is months or decades after purchase.

14.    Despite knowing all of the above, for decades, Monsanto has intentionally refused to conduct tests on real world Products to find out how much NNG is actually in the Products that consumers use. Stephen Wratten, Monsanto's registration manager for glyphosate (i.e., the person in charge of interfacing with EPA about the Products), put this bluntly in a 2003 email: "There is a lingering concern about aged samples of dry products…I would avoid sampling long-aged dry product from retail." Wratten Tr. at 136:6-11. When asked point blank why he would "avoid" testing real world products, he stated: "because you might find differences from when it was manufactured." *Id*. at 138:2-3. With respect to NNG, he conceded "you might find more than you started with." *Id*. at 138:6-7. And then acknowledged testing "***might result in you having to recall a bunch of product***." *Id*. at 138:18-139:2 (emphasis supplied). When asked directly if Monsanto would have to recall product that had more than 1 ppm of NNG, he said "***yes***." *Id*. (emphasis supplied.)

15.    The hidden levels of NNG in the Products is only coming to light now because, in addition to withholding relevant information from EPA, Monsanto concealed the problem with NNG in the Products in the multidistrict litigation pending in this District.

16.    In 2017, plaintiffs in *In re: Roundup Products Liability Litig.* sought discovery on impurities, including a deposition of Eric Haupfear, who as discussed below, has knowledge of the topic. In response, lawyers for Monsanto claimed that the levels of impurities in Roundup branded herbicides "are well within EPA safety standards." *See In re: Roundup Products Liability Litig.*, No. 3:16-md-02741-VC, ECF No. 150-3 at 18 (N.D. Cal. Feb. 20, 2017). Based on that representation, the Court denied further discovery on impurities like NNG in Defendants' glyphosate products. *See id.* at ECF No. 165 (Feb. 24, 2017). Only recently, discovery in a parallel state court action revealed that Monsanto knew (or, at a minimum, should have known) that the amount of NNG in older, concentrated products that consumers nationwide have in their garages is likely not "well within EPA safety standards." *See generally* Wratten Tr. In fact, Monsanto knew that the level of impurities in Roundup could, and, in fact, in instances dating back to 1997

actually did, exceed EPA levels, and, in 2004, had proof that the products were capable of reaching levels that were 80 times over the regulatory limit. More glaringly, Monsanto knew that it could not control NNG post-manufacture and that the Products' exposure to nitrites, which are widespread in water and air, causes more NNG to form, pushing levels over regulatory limits. Yet, Monsanto concealed this information from the MDL Court, the EPA, and consumers nationwide.

17.     Monsanto has not acted alone in concealing the safety hazards associated with the Products. In 2018, Bayer Aktiengesellschaft ("Bayer AG") acquired Monsanto and subsequently appointed Bayer CropScience as the EPA registrant for the Products.  From 2018 through at least 2019, Monsanto and Bayer CropScience sold some Products through a distributor, Seamless Control, which independently registered the Products with EPA. Further, since around 1998, Scotts served as Monsanto's, and later Bayer CropScience's, exclusive distributor and marketer for at least one Product, the Roundup Weed & Grass Killer Super Concentrate.

18.     Monsanto, Bayer CropScience, Scotts, and Seamless Control sold, or caused the Products to be sold, to consumers even though they knew, or should have known, at the time of those sales, that the Products were defective because they could (and almost invariably would) degrade into higher and higher levels of NNG that would ultimately exceed regulatory limits. This was true even if the Product was used, and stored, in accordance with the labels. More egregiously, Defendants found evidence that, in certain instances, its glyphosate-based products had over 1 ppm of NNG on the factory floor. This inherent defect presents a serious health hazard that makes the Products unreasonably unsafe because it exposes consumers to a presumptive carcinogen in excess of levels EPA considers safe when consumers mix or spray the Products. As a result, Defendants violated the law, including, without limitation, breaching the Products' express and implied warranties.

19.     Further, the Products' registrations are conditioned upon compliance with the certified limits for impurities, like NNG. A pesticide is registered and legal to sell *only if* it *never* exceeds the certified limits *at any point in time*, unless "the product label bears a statement prohibiting use after a certain date," (i.e., an expiration date) in which case, the certified limits

apply through the time provided for on the label. 40 C.F.R. § 156.350. In the absence of such a statement, if a pesticide exceeds the impurity certified limit *at any point in time*, that pesticide is and always has been unregistered. None of the Products here included a prohibition on their use after a certain date. Because the Products were substantially likely to exceed 1 ppm NNG, even if used and stored in accordance with the labels, the Products were always unregistered and were illegal to sell and distribute in violation of Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and the California Food & Agriculture Code.

20.     By marketing, distributing, and selling the Products under the names of registered pesticides like "Roundup QuikPRO Herbicide" and "Roundup Weed & Grass Killer Super Concentrate," Defendants misled consumers into believing they were actually buying products that are chemically identical to those like the "Roundup QuikPRO Herbicide" and "Roundup Weed & Grass Killer Super Concentrate" registered with EPA. However, as explained above, they are not. EPA approved only Products that could not and did not develop NNG in excess of 1 ppm *at any point in time* over the course of the Products' *entire* life cycle. Because the Products can and invariably do degrade, pushing NNG levels above regulatory limits, they were illegal. Selling, distributing, and marketing the Products under the guise that they were EPA-approved and have chemical compositions consistent with registered herbicides was unlawful and misleading.

21.     Defendants unlawfully, unfairly and or deceptively manufactured, marketed and sold, or caused to be manufactured, marketed and sold, the Products and engaged in illegitimate business or dishonest dealings by selling and distributing the Products without including a "Not for sale or use after [date]." EPA requires that when "a pesticide formulation changes chemical composition significantly," such as here, the product "must bear the following statement in a prominent position on the label: 'Not for sale or use after [date].'" 40 C.F.R. § 156.10(g)(6). The Products' chemical composition changes significantly because they form higher and higher levels of NNG that can, and invariably do, exceed EPA's certified limits. Defendants knew this. Yet, none of the Products included "Not for sale or use after [date]."

22.     Consumers reasonably expect, in the absence of a prominent expiration date, that

the Products will remain suitable for use indefinitely. It can take consumers years to go through a single unit, because the Products are highly concentrated and predominantly sold in bulk sizes (i.e., over a gallon). But the Products are substantially likely to develop unsafe and unlawful levels of NNG, a presumptive carcinogen, through consumers' ordinary use consistent with the labels. Had Defendants included a "Not for sale or use after [date]" on the Products, as they were required to do under the law, it would have revealed that the Products expire. That information was material to reasonable consumers. Accordingly, Defendants' failure to include a "Not for sale or use after [date]" makes the sale, distribution, and marketing of the Products unlawful, unfair and misleading

## **PARTIES**

23.    Plaintiff Scott Koller is, and was at all relevant times, an individual and resident of and is domiciled in Brentwood, California.

24.    Plaintiff Tim Ferguson is, and was at all relevant times, an individual and resident of and is domiciled in Manteca, California.

25.    Ruby Cornejo is, and was at all relevant times, an individual and resident of and is domiciled in Galt, California.

26.    Plaintiff John Lysek is, and was at all relevant times, an individual and resident of and is domiciled in Redding, California.

27.    Defendant Monsanto Company ("Monsanto"), is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto is registered to do business in California. Monsanto is engaged in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the Products either directly or through its agents. Upon information and belief, Monsanto has sold or caused the sale of millions of Products within the state of California. Bayer AG acquired Monsanto in June 2018. Monsanto is an indirect, wholly-owned subsidiary of Bayer AG.

28.    Defendant Bayer CropScience LP ("Bayer CropScience") is a Delaware limited partnership with its principal place of business in Research Triangle Park, North Carolina. It is an indirect subsidiary of Bayer AG. Bayer CropScience is registered to do business in California.

Upon information and belief, Bayer CropScience has sold or caused the sale of some or all of the Products within the state of California. Bayer CropScience's general partner is Athenix Corporation, which is a North Carolina corporation with its principal place of business located in St. Louis, Missouri. Bayer CropScience's limited partners are:

- Monsanto
- Bayer CropScience Inc., a New York corporation with its principal place of business located in St. Louis, Missouri.
- Bayer CropScience Holding, Inc., a Delaware corporation with its principal place of business located in St. Louis, Missouri.
- Bayer Seeds B.V., a private company with limited liability incorporated under the laws of the Netherlands with its principal place of business located in Mijdrecht, Netherlands.
- Hornbeck Seed Company, Inc., an Arkansas corporation with its principal place of business located in St. Louis, Missouri.
- AgraQuest, Inc., a Delaware corporation with its principal place of business located in St. Louis, Missouri.
- Bayer CropScience LLC, a Delaware limited liability company with its principal place of business located in St. Louis, Missouri whose sole member is BCS US Holding LLC. BCS US Holding LLC is a Delaware limited liability company with its principal place of business located in Research Triangle Park, North Carolina whose sole member is KWA Investment IV LLC. KWA Investment IV LLC is a Delaware limited liability company with its principal place of business located in Wilmington, Delaware. Its sole member is KWA Investment III LLC.

29.     KWA Investment III LLC is a Delaware limited liability company with its principal place of business located in Wilmington, Delaware, whose members are Bayer New TH M1763 LLC, Bayer New MY M1455 LLC, Bayer New NL M3644 LLC, Bayer New CZ M3204 LLC, Bayer New CH M3868 LLC, Bayer New CA M5015 LLC, Bayer New MX M3640 LLC, Bayer New ZA M3743 LLC, Bayer New UA M3702 LLC, Bayer New BE M3155 LLC, Bayer New AU M1059 USD LLC, Bayer New TK M3970 LLC, Bayer New HU M3440 LLC, Bayer

New RO M3695 LLC, Bayer New DE M3385 LLC, Bayer New MA M3130 LLC, Bayer New RU M3708 LLC, Bayer New PL M3655 LLC; Bayer Corporation; and Bayer US Holding LP.

30. Bayer New TH M1763 LLC is a Delaware limited liability company with its principal place of business located in St. Louis, Missouri. Its sole member is Seminis Vegetable Seeds, Inc., a California corporation whose principal place of business is located in St. Louis, Missouri.

31. Bayer New MY M1455 LLC, Bayer New NL M3644 LLC, and Bayer New CZ M3204 LLC are Delaware limited liability companies whose sole member is Monsanto.

32. Bayer New CH M3868 LLC, Bayer New CA M5015 LLC, Bayer New MX M3640 LLC, Bayer New ZA M3743 LLC, Bayer New UA M3702 LLC, Bayer New BE M3155 LLC, Bayer New AU M1059 USD LLC, Bayer New TK M3970 LLC, Bayer New HU M3440 LLC, Bayer New RO M3695 LLC, Bayer New DE M3385 LLC, Bayer New MA M3130 LLC, Bayer New RU M3708 LLC, Bayer New PL M3655 LLC are all Delaware limited liability companies with their principal places of business located in St. Louis, Missouri and are indirect subsidiaries of Olympia Corporation, a Delaware corporation whose principal place of business is in St. Louis, Missouri.

33. Bayer Corporation is an Indiana corporation with its principal place of business located in Pittsburgh, Pennsylvania.

34. Bayer U.S. Holding LP is a Delaware limited partnership with its principal place of business located in Wilmington, Delaware. Its sole general partner is Bayer World Investments B.V., a Netherlands limited liability company with its principal place of business located in the Netherlands and its sole limited partner is Bayer Solution B.V., a Netherlands limited liability company with its principal place of business located in the Netherlands. Bayer Solution B.V. is a wholly-owned by Bayer World Investments B.V.

35. Bayer CropScience is listed as a registrant for numerous pesticides with the California Department of Pesticide Regulation.

36. Defendant The Scotts Company LLC ("Scotts") is a Delaware limited liability company with its principal place of business in Marysville, Ohio. Scotts is registered to do

business in California. Based on filings with the California Secretary of State, Scotts' member is The Scotts Miracle-Gro Company which is an Ohio corporation with its principal place of business in Marysville, Ohio. Since around 1998, Scotts has been Monsanto's exclusive distributor for certain Monsanto products, including the Weed & Grass Killer Super Concentrate and possibly other Products. It also has performed some formulation work for Monsanto. It also unlawfully sold and distributed unregistered, illegal and misbranded pesticides both directly and through Seamless Control, as discussed below.

37.     Defendant Seamless Control LLC ("Seamless Control") is a Delaware limited liability company. Based on its filings with the California Secretary of State, its principal place of business is in St. Louis, Missouri, and its managing member is Anthony Leisure, who is an individual who resides in St. Louis, Missouri. Its other members are Thierry Chenet and Gilles Galliou who both reside in St. Louis Missouri.

38.     Monsanto initially registered each of the Products with EPA. Monsanto also registered the Products in California. Each Product's EPA and California registration numbers, the dates of registration, current EPA registrant, and size, if known, are identified in Exhibit 1.

39.     From time of their initial registrations, Monsanto designed and manufactured all of the Products and caused them to be distributed, marketed, and sold at brick and mortar and online retailers throughout the United States, including in California. Monsanto made express and implied warranties directly to consumers that are on the labels on the Products, which are attached hereto as follows:

| Ex. No. | Product |
|---------|---------|
| 2 | Roundup Weed & Grass Killer Super Concentrate |
| 3 | Roundup PRO Concentrate Herbicide |
| 4 | Roundup QuikPRO Herbicide |
| 5 | Roundup PROMAX Herbicide |
| 6 | Roundup Custom for Aquatic & Terrestrial Use |
| 7 | Ranger Pro Herbicide |
| 8 | Roundup PRO Herbicide |
| 9 | Roundup EasyMix Dry Concentrate Weed & Grass Killer |
| 10 | Roundup Quik Stik |
| 11 | Roundup ProDry Herbicide |

40.    Monsanto breached the Products' express and implied warranties, as explained below.

41.    Bayer AG acquired Monsanto in 2018. After the acquisition, Bayer CropScience, with Monsanto's assistance, continued to manufacture, sell and distribute, through third parties, Products with the labels identified in the following table:

| Ex. No. | Product |
|---------|---------|
| 12 | Roundup PRO Concentrate Herbicide |
| 13 | Roundup QuikPRO Herbicide |
| 14 | Roundup PROMAX Herbicide |
| 15 | Roundup Custom for Aquatic & Terrestrial Use |
| 16 | Ranger Pro Herbicide |

42.    After Bayer AG's acquisition of Monsanto in 2018, Bayer CropScience became the registrant with EPA for the following Products:

| |
|---|
| Roundup PRO Concentrate Herbicide |
| Roundup QuikPRO Herbicide |
| Roundup PROMAX Herbicide |
| Roundup Custom for Aquatic & Terrestrial Use |
| Ranger Pro Herbicide |
| Roundup PRO Herbicide |
| Roundup ProDry Herbicide |

43.    Upon information and belief, Bayer CropScience currently manufactures and distributes, through third-parties, Roundup PRO Concentrate Herbicide, Roundup QuikPRO Herbicide, Roundup PROMAX Herbicide, Roundup Custom for Aquatic & Terrestrial Use, and Ranger Pro Herbicide, which are, in turn, sold to consumers across the United States, including in California. Bayer CropScience also currently markets and creates advertisements for Roundup PROMAX Herbicide, Roundup QuikPRO Herbicide, Roundup Custom for Aquatic & Terrestrial Use, and Roundup PRO Concentrate Herbicide. Monsanto, however, remains the manufacturer for the other Products that are still on the market and sells and distributes those Products, through third parties, to consumers nationwide, including in California. The Monsanto labels identified above for those Products also remain on those particular Products. Further, Monsanto is and has been, at all relevant times, listed as the registrant for the Products with California's Department of Pesticide Regulation.

44.    At least since 2020, possibly earlier, Bayer CropScience made express and implied warranties on the labels for Roundup PRO Concentrate Herbicide, Roundup QuikPRO Herbicide, Roundup PROMAX Herbicide, Roundup Custom for Aquatic & Terrestrial Use, and Ranger Pro Herbicide to consumers nationwide and in California, and, as alleged herein, Bayer CropScience breached those warranties. Copies of the relevant labels with the warranty language from Bayer CropScience are in Exs. 12 to 16.

45.    Since around 1998, Scotts has served as Monsanto's exclusive distributor for its

glyphosate-based products in the Lawn and Garden sector, which includes the Roundup Super Concentrate Weed & Grass Killer. As a result, Scotts marketed and distributed the Roundup Super Concentrate Weed & Grass Killer to retailers, which, in turn, sold the Roundup Super Concentrate Weed & Grass Killer to consumers nationwide, including in California on behalf of Monsanto.

46.     Beginning in 2018, Monsanto, and later on BayerCropScience, expanded its relationship with Scotts and entered into a joint venture with Scotts to have Scotts sell, distribute and market some its glyphosate-based products in the Industrial, Turf and Ornamental sector, which includes many of the Products. As part of the joint venture, Monsanto and Scotts formed Seamless Control, which they jointly owned either directly or indirectly through holding companies. After Bayer AG's acquisition of Monsanto, Bayer CropScience became part of the joint venture with Scotts. Eventually, Bayer AG took over ownership of Seamless Control either directly or through holding companies, and, as of December 31, 2019, Bayer AG disclosed it had a 100% interest in Seamless Control. Further, as of May 1, 2019, Seamless Control identified its three members, each of whom were senior executives with Bayer CropScience.

47.     From 2018 to 2019 or 2020, Seamless Control distributed and marketed some of the Products to retailers for sales to consumers nationwide pursuant to the joint venture. Though Monsanto had initially registered the Products with EPA, EPA approved registrations for the following Products on the following dates with Seamless Control as the registrant (the "Joint Venture Products"). Copies of the labels for the Joint Venture Products are in the Exhibits identified below.

CLASS ACTION COMPLAINT

| Ex. No. | Product | Date registered for Seamless | New EPA Registration No. |
|---|---|---|---|
| 17 | Roundup Custom for Aquatic & Terrestrial Use | February 16, 2018 | EPA Reg. No. 93236-2 |
| 18 | Roundup QuikPRO Herbicide | February 22, 2018 | EPA Reg. No. 93236-4 |
| 19 | Roundup PROMAX Herbicide | April 18, 2018 | EPA Reg. No. 93236-3 |
| 20 | Roundup PRO Herbicide | April 20, 2018 | EPA Reg. No. 93236-1 |
| 21 | Roundup PRO Concentrate Herbicide | May 25, 2018 | EPA Reg No. 93236-6 |
| 22 | Ranger Pro | May 25, 2018 | EPA Reg. No. 93236-5 |

48.     The Joint Venture Products' registrations with EPA were based on Monsanto's registrations of the Products and are subject to the same restrictions as to the formula.

49.     In connection with Seamless Control's sale, distribution and marketing of the Joint Venture Products, Seamless Control made express and implied warranties to consumers nationwide, including to California consumers, on the Joint Venture Products' labels. The labels in effect at the time Seamless Control sold and distributed the Joint Venture Products, which include the specific language of Seamless Control's express warranties, are attached hereto as Exhibits 17 to 22. Seamless Control breached the Joint Venture Products' express and implied warranties, as explained below.

50.     Upon information and belief, Monsanto, and, after its acquisition, Bayer CropScience, was responsible for coordinating the registration of the Joint Venture Products on behalf of Seamless Control. Stephen Adams, who was Monsanto's regulatory affairs manager at the time, filed the registration applications for each of the Joint Venture Products on behalf of Seamless Control. Adams also served as Senior Regulatory Affairs Manager for Bayer CropScience after Bayer AG's acquisition of Monsanto.  As a regulatory affairs manager, Adams managed all aspects of the Products' registrations with EPA, which included data submission and regulatory compliance. As part of that job, he had to be familiar with the historic submissions to EPA and studies conducted in support of compliance for the Products. Because he was an agent

for Seamless Control on Monsanto's and later Bayer CropScience's behalf, Seamless is imputed with Adams' knowledge about the Products.

51.     Seamless Control cancelled the registrations for each of the Joint Venture Products on December 21, 2020 and, upon information and belief, has not sold, distributed, or marketed them since then.

52.     During the joint venture with Seamless, Monsanto and, later on post-acquisition, Bayer CropScience, manufactured the Products that were still on the market at the time and distributed them to retailers through third-parties, which included shipping, holding for shipment, releasing for shipment, and holding for distribution, within the meaning of 7 U.S.C. § 136(gg). The retailers, in turn, sold the Products to consumers in the United States, including California.

53.     Defendants unlawfully sold and/or distributed: (i) unregistered pesticides throughout the United States, including in California; (ii) pesticides that had chemical compositions that differed from what was allowed under their respective Confidential Statements of Formula at the time of their distribution or sale; and (iii) misbranded pesticides. Defendants uniformly represented that each of the Products contained an EPA-approved, registered pesticide at the time consumers' purchases, even though they did not. Defendants also actively concealed the safety hazard and defect with the Products from consumers and regulators alike. As the registrants and/or manufacturers of the Products, Monsanto, Seamless Control and Bayer CropScience had "a continuing obligation to adhere to FIFRA's labeling requirements." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 438 (2005). Monsanto, Seamless Control and Bayer CropScience knowingly defied this fundamental requirement by omitting a "Not for sale or use after [date]" from the labels, despite knowing the Products were prone to developing uncontrollable and unlawful levels of NNG, even when used and stored under ordinary conditions consistent with the Products' labels.

54.     The acts and omissions of Defendants concurred with and contributed to the various acts and omissions of each in proximately causing the injuries and damages as herein alleged.

## JURISDICTION AND VENUE

55.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one class member and one Defendant are citizens of different states.

56.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from Products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California. Defendants know that the Products are and were sold throughout California, and caused the Products to be sold across the United States, including California.

57.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District, including Plaintiffs' purchases of the Products.

58.     In accordance with California Civil Code Section 1780(d), Plaintiff Koller concurrently files herewith a declaration establishing that, at various times throughout the class period, he purchased Roundup Weed & Grass Killer Super Concentrate from stores in the Brentwood and Antioch California during the last four years. (Plaintiff Koller's declaration is attached hereto as Exhibit 23.) More than thirty days prior to the filing of this Complaint, Plaintiff Koller further provided to Defendants Monsanto, Bayer CropScience, and Seamless Control notice and demand that sales of the Products violated, *inter alia*, FIFRA, 41 C.F.R. §158.350, 40 C.F.R. § 156.10(g)(6), 40 C.F.R. § 156.10(a)(5)(ii), Cal. Food & Agric. Code §§ 12991, 12881, Cal. Civ. Code § 1770(a), the Magnusson-Moss Warranty Act, Consumers Legal Remedies Act of California, and California's Unfair Competition Law. They did nothing to cure the violations. Instead, they issued a blanket denial.

59.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### I.  NITROSAMINES ARE A KNOWN CARCINOGENIC BY-PRODUCT OF GLYPHOSATE IN THE PRODUCTS.

60.     Nitrosamines, as a class of molecules, are known carcinogens, and/or convert readily to potent carcinogens. *See, e.g.*, A.R.Tricker and R.Preussmann, "Carcinogenic N-nitrosamines in the diet: occurrence, formation, mechanisms and carcinogenic potential," Mutation Research/Genetic Toxicology,  Volume 259.3–4: 277-289 (March–April 1991); Mirvish, Sidney S., "Kinetics of dimethylamine nitrosation in relation to nitrosamine carcinogenesis." Journal of the National Cancer Institute 44.3: 633-639 (1970); Straif, Kurt, et al., "Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers." Occupational and Environmental Medicine, 57.3: 180-187 (2000); Loh, et al.; "N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study," Am. J. Clin. Nutr. 93.5:1053-061 (May 2011).

61.     Monsanto, too, has historically acknowledged this. For instance, in 2015, William Heydens, Monsanto's Product Safety Assessment Strategy Lead, wrote that "many N-Nitroso compounds are carcinogenic."[3]

62.     Scotts also has been aware. In 2003, a Monsanto employee forwarded an email to other Monsanto employees along and Jill Fairbrother, a Scotts employee.[4] The forwarded email was from a third-party who quoted a genetic toxicology consultant who stated "over 75% of all other N-nitroso compounds so tested have been shown to cause cancer by way of tumor formation."

63.     Nitrosamines are compounds with an amine (i.e., a nitrogen with three single bonds to other atoms) that is bonded directly to a nitroso group (i.e., a nitrogen and oxygen connected by a double-bond). This structure is sometimes referred to as ">N–N=O", where the lines represent electron bonds between the various nitrogen ("N") and oxygen ("O") atoms.

---

[3] https://usrtk.org/wp-content/uploads/bsk-pdf-manager/2019/04/Heydens-issues-with-glyphosate.pdf

[4] https://www.baumhedlundlaw.com/assets/monsanto%20roundup%20pages/secret%20documents/Email-Showing-Monsanto-Had-Long-Known-of-N-ntirosoglyphosate-NNG-in-Roundup.pdf

Because the nitroso group (–N=O) is bonded to the amine nitrogen (>N–), these compounds are also called N-nitrosamines. An exemplary general nitrosamine structure is shown below:

$$R^1 \underset{\underset{N=O}{|}}{N} R^2$$

64.     Each "R" in the figure above can be a wide variety of organic (i.e., carbon-based) structures.

65.     Reaction of secondary amines (i.e., compounds with a nitrogen bonded to two carbons) with nitrous acid produces nitrosamines. Nitrous acid forms when nitrites are protonated, which occurs readily in the presence of water. Thus, exposure of secondary amines to nitrites produces nitrosamines.

66.     A nitrosamine formed by exposure of a secondary amine to nitrites is N-Nitrosoglyphosate.

67.     Glyphosate is an organophosphate compound with the structure shown below:



68.     The nitrogen structure in glyphosate is a secondary amine. It therefore reacts with nitrous acid and/or nitrites to form N-nitrosamines.

69.     In the presence of nitrites (or other nitrosating compounds), the secondary amine in glyphosate is nitrosylated to become N-nitrosoglyphosate, with the structure shown below:



- 19 -
CLASS ACTION COMPLAINT

70.     Glyphosate is the active ingredient of the Products. The above N-nitrosamine is thus a by-product formed by reaction of the Products with nitrites and any other nitrosating agents, such as nitrogen oxide (which can come from exhaust and other sources).

**II.     EPA LIMITS NNG LEVELS TO 1 PPM.**

71.     The EPA is charged with regulating the sale and distribution of pesticides in the United States. Due to the health risks associated with nitrosamines, the EPA has consistently found that herbicides "contaminat[ed] with *N*-nitroso compounds at levels of one ppm or greater would be cause for concern." 55 Fed. Reg. 17560.

72.     EPA developed its policy addressing n-nitroso compounds in pesticides in 1980. *See* 45 Fed. Reg. 42854 (June 25, 1980). In that policy, EPA acknowledged that "[s]ome pesticides are contaminated with N-nitroso contaminants. These substances are not intentional additives of the pesticide product, but are rather chemical compounds formed during synthesis of the active ingredient, or during formulation or storage." 45 Fed. Reg. 42855.

73.     EPA went on to explain that 80 N-nitrosamines had been tested, and, of those tested, 80% were carcinogenic. In light of that, EPA concluded that "[s]uch compounds therefore present a potential risk to the public health." 45 Fed. Reg. 42855.

74.     EPA adopted a process to evaluate the risks associated with nitrosamines. First, the EPA requires applicants to submit chemistry data showing whether the product is contaminated with N-nitroso compounds and, if so, at what levels. If the level is below 1 ppm, then the EPA may treat the product under the usual registration procedures. If the level is above 1 ppm, then the applicant must submit further exposure and risk data. Specifically, "[f]or each product shown to contain N-nitroso contamination above 1 ppm," EPA requires submission of data "on the potential oncogenic risk of the contaminant." 45 Fed. Reg. 42856.

75.     EPA made clear that "[i]n the absence of acceptable oncogenic testing with the specific N-nitroso compound, the Agency ***will assume that the contaminant is as potent a carcinogen as N-nitrosodiethylamine (NDEA)***." 45 Fed. Reg. 42856 (emphasis added). EPA

classifies NDEA as a probable carcinogen. EPA, therefore, presumes nitrosamines are carcinogenic unless the manufacturer provides acceptable oncogenic testing proving otherwise.

76.     Consistent with EPA's policy on nitrosamines, EPA limits NNG in glyphosate products to 1 part per million (ppm).

77.     Monsanto has been fully aware of this limit.

78.     Monsanto's former registration manager, Stephen Wratten, explained that the 1 ppm cap on NNG in glyphosate products is "a limit that we [Monsanto] agreed on with EPA." Wratten Tr., 154:23-24.

79.     Stephen Adams, Monsanto's Regulatory Affairs Manager at the time, also stated in an email in 2014 that "formulations containing the ethanolamine salt form of Glyphosate…can be converted into N-nitroso-glyphosate (NNG), an impurity of toxicological significance with an upper concentration limit of 1 ppm in Glyphosate products."[5]

80.     Donna Farmer – Monsanto's head of toxicology – reiterated this as well, stating in a July 31, 2015 email that the concept "we" (i.e. Monsanto) "rel[ies] on globally is" that EPA "has determined that even potent nitrosamine carcinogens would not be expected to create risk concerns if present in pesticides at levels of 1 ppm or lower."[6] According to Dr. Farmer, regulators like EPA "do not require special testing or risk assessment if the level's at 1 ppm or lower."

81.     Because Defendants maintain, and EPA has believed, that the Products do not and cannot contain NNG levels over 1 ppm, EPA has not required Defendants to provide "acceptable oncogenic testing" in accordance with EPA's nitrosamine policy. To date,

---

[5]https://www.baumhedlundlaw.com/assets/monsanto%20roundup%20pages/secret%20documents/Monsanto-Executive-Steven-Adams-on-NNG-Issue-Dont-Want-to-Draw-Attention-to-the-Toxicity-of-Our-Product.pdf
[6]https://www.baumhedlundlaw.com/assets/monsanto%20roundup%20pages/secret%20documents/Internal-Email-from-Donna-Farmer-Monsanto-Would-Rather-Keep-Roundup-NNG-Levels-Below-1ppm-Rather-Than-Debate-Biological-Activity.pdf

Defendants have never provided EPA with acceptable oncogenic testing establishing that NNG is not carcinogenic.

82.    Rather, of the few toxicity studies that Monsanto has done for NNG, most of which are discussed in the June 1986 Guidance for Reregistration of Pesticide Products Containing Glyphosate as the Active Ingredient ("June 1986 Guidance"), almost all of them were conducted by IBT, a lab known for engaging in extensive scientific fraud. Beginning in 1976, FDA and EPA discovered serious deficiencies in tests conducted by IBT to support the registration of numerous pesticides. Among those deficiencies were major discrepancies between raw data and reports of pesticide toxicology studies conducted by IBT. EPA explained, "[t]he IBT scandal shook the industry and government regulators," and by 1977, EPA placed a moratorium on registrations involving data from IBT.[7] EPA then proceeded to launch a major audit of IBT tests and came to find the majority of them to be invalid.[8] Ultimately, EPA referred the matter to the Department of Justice which culminated in convictions of three IBT executives, including its president (who happened to be a former Monsanto employee), for mail fraud and making false statements to the U.S. Government.

83.    EPA further determined that each of the IBT toxicity studies on NNG were inadequate. *See* June 1986 Guidance at 11-12. For example, EPA concluded that one chronic toxicity study conducted by IBT that was performed on rats was "invalid" due to "dosing of the control groups with an excessive amount of NaC1 which resulted in high mortality of control animals." *Id*. The other chronic toxicity study done on dogs was also inadequate because the study "lacked supporting raw data." *Id*.

84.    A 90-day subchronic oral toxicity study performed on rats – also conducted by IBT – was also deficient "due to inadequate reporting of clinical signs and necropsy data, and inadequate identification of the test material." *Id*.

---

[7] https://usrtk.org/wp-content/uploads/2017/10/EPA-summary-of-IBT-review-program.pdf
[8] *Id*.

85.     EPA also rejected the mechanistic studies submitted by Monsanto finding "no acceptable studies for mutagenic or reproductive effects are available at present for NNG." *Id.*

86.     Despite the serious defects with the NNG toxicity studies, EPA "determined that oncogenicity testing of nitroso contaminants will normally be required only in those cases in which the level of nitroso compounds exceeds 1.0 ppm." *Id.* EPA further found that "[b]ecause the amount of N-nitroglyphosate is less than 1.0 ppm no additional toxicology data are required". *Id.*

87.     Monsanto attempted to conduct one, non-IBT, long-term carcinogenicity lab test of NNG in mice. The study failed because too many mice exposed to high doses of NNG died before the completion date of the study.[9] Because of the excessive deaths, the study was terminated. Monsanto never informed EPA of the results.

88.     Monsanto attempted to repeat the failed study in 1984. Like the first attempted study, many of the animals exposed to high doses of NNG died early on. Although the second study was completed, it revealed a statistically significant increase in malignant lymphomas in male mice. Monsanto never informed EPA about the study.

89.     Indeed, based on EPA's own statements, it has not received any information from Monsanto related to NNG since 1993 or earlier.

90.     EPA has, thus, operated with the understanding that the Products do not contain levels of NNG over 1 ppm. EPA reaffirmed this position as recently as May 18, 2021 in a brief it submitted to the 9th Circuit in a case successfully challenging EPA's January 2020 interim registration review decision determining that glyphosate does not pose "any unreasonable risk to man or the environment." *NRDC v. United States EPA*, Nos. 20-70787, 20-70801, ECF No. 80-1 at 36-7 (9th Cir. May 18, 2021).

91.     In that brief, EPA explained that it rejected the challenge to glyphosate's registration based on NNG because it found "NNG content was not toxicologically significant."

---

[9] https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents-2/letter-discussing-18-month-chronic-mouse-gavage-1979.pdf

CLASS ACTION COMPLAINT

EPA based that conclusion on the fact that "[n]o new data have been presented to warrant a reevaluation of the Agency's conclusion." *Id*. at 36. Accordingly, EPA confirmed that, from at least the 1993 re-registration of glyphosate to May 18, 2021, EPA has not received any new data suggesting that levels of NNG were above 1 ppm in glyphosate-based products.

92.     EPA nonetheless made clear in the same brief that "[i]f individual products contain contaminants that exceed EPA's level of concern, these must be reported to EPA and are assessed on a case-by-case basis." *Id*. at 37.

93.     Defendants, however, have been aware of evidence for decades showing the Products are substantially likely to develop elevated levels of NNG far in excess of the 1 ppm limit, even when used and stored in accordance with label directions. Monsanto, in fact, had seen first-hand instances of NNG in its glyphosate-based products reaching levels far in excess of 1 ppm. Yet, Defendants never reported any of that information or evidence to EPA.

### III.    NNG FORMS AS AN IMPURITY IN GLYPHOSATE-BASED PRODUCTS.

94.     Monsanto initially registered the active ingredient in the Products, glyphosate, with EPA in 1974. EPA has understood that NNG forms as an impurity in technical grade glyphosate.

95.     EPA regulations requires registration applicants to provide a Confidential Statement of Formula and certify the ingredients and other substances within a pesticide. In particular, 41 C.F.R. § 158.350 requires registration applicants to set an upper certified limit for impurities of toxicological significance like NNG. *See* 41 C.F.R. § 158.350. The upper certified limit represents the maximum amount of the impurity allowable within an ingredient or product.

96.     EPA uses the certified limits to review the chemical composition of the pesticide and to evaluate whether the pesticide will cause unreasonable adverse effects on human health and the environment by looking at, among other things, the toxicity of the product if hazardous ingredients and impurities are present at their upper certified limits.

97.     To that end, Monsanto proposed, and EPA accepted, an upper certified limit of NNG within glyphosate acid at 2.5 ppm.

98.     Though all the Products have glyphosate as their primary, active ingredient, the amount of glyphosate acid within a Product depends on the type of glyphosate salt used and its concentration within the Product. The reason is because the Products are mixtures of different substances and contain other ingredients like surfactants or water in liquid products. The non-glyphosate ingredients dilute the amount of glyphosate, which, in turn, decrease the amount of NNG within the formulated product at manufacture.

99.     At the time EPA and Monsanto set the limit on NNG, Monsanto's most concentrated product on the market was Rodeo, which was made of 40% glyphosate acid.

100.     Stephen Wratten explained in an internal email, dated May 4, 2010, that Monsanto's rationale behind setting the limit of NNG at 2.5 ppm in glyphosate acid was that "2.5 parts per million NNG in pure glyphosate acid would lead to a level of 1 part per million in the most highly concentrated product Rodeo." Wratten Tr. 160:8-17.

101.     Wratten later explained: "It's just math. .4 times 2.5 is 1. So if Rodeo is 40 percent glyphosate acid at a level of 2.5, that becomes 1 part per million in Rodeo." Wratten Tr. 160:23-25.

102.     Thereby, Monsanto calculated, and EPA accepted, the limit of NNG for the glyphosate product(s) by multiplying the percent of glyphosate acid within the product by 2.5 (the upper limit for NNG in glyphosate acid). Wratten then confirmed this calculation applies to all of Monsanto's glyphosate-based products, which necessarily includes the Products at issue in this case. *Id*. 161:1-163:14.

103.     The expected limit, or level, of NNG within any of the Products can accordingly be determined by simply multiplying the percentage of glyphosate acid in the Product by 2.5— i.e., [percent glyphosate acid in product] x 2.5 = ppm NNG.

IV.     **MONSANTO INTRODUCES PRODUCTS WITH HIGH CONCENTRATIONS OF GLYPHOSATE TO MARKET.**

104.     Since the initial registration of glyphosate in 1974, Monsanto registered with EPA the following salt forms of glyphosate on or around the following dates: isopropylamine salt (December 1, 1982), ammonium salt (March 22, 1982), and potassium salt (January 5, 1982).[10]

105.     All of Monsanto's glyphosate-based products – including those consisting of salt forms of glyphosate – inherited the limits of glyphosate acid, so the upper limit of 2.5 ppm in glyphosate acid applied to all of Defendants' glyphosate-based products, irrespective of the form of glyphosate in the product. Wratten Tr. 165:23-166:1.

106.     Since the launch of Rodeo, which has since been re-branded as Roundup Custom for Aquatic & Terrestrial Use, Monsanto has continued to manufacture, market, advertise and sell more and more concentrated formulations. In 1999, Monsanto registered Ranger Pro with EPA, which is 41% glyphosate. The following year, Monsanto added Pro Concentrate to its line, which is 50.2% glyphosate. By the early 2000s, Monsanto introduced a host of super-concentrated formulations, including Roundup ProDry Herbicide, which had 71.4% glyphosate, Roundup Ultra Dry Herbicide, which had 71.4% glyphosate, and Roundup QuikPRO Herbicide which has 73.3% glyphosate.

107.     Increasing the amount of glyphosate within the Product necessarily means that levels of NNG within the Product concomitantly increase.

108.     Monsanto knew this. It similarly knew that increasing the concentration of glyphosate acid above 40% in glyphosate-based products necessarily meant that the presumptive upper certified limit would exceed EPA's limit of 1 ppm of NNG for glyphosate-based products.

109.     Roundup QuikPRO Herbicide ("QuikPRO"), for instance, has 73.3% glyphosate and 66.6% glyphosate acid. Applying Monsanto's own calculation of estimated NNG content, (i.e., 2.5 x .666) demonstrates that Monsanto itself expected QuikPRO to have much higher concentrations of NNG, and a presumptive upper limit of 1.665 ppm of NNG.

---

[10] https://www.epa.gov/sites/default/files/2020-01/documents/glyphosate-interim-reg-review-decision-case-num-0178.pdf

110.    As such, **_any product_** with over 40% glyphosate acid would presumptively have a limit above EPA's limit of 1 ppm. Monsanto accordingly knew that its products with over 40% glyphosate acid had higher levels of NNG at manufacture.

111.    While Monsanto was aware that the Products had elevated levels of NNG and, accordingly, some of the Products had upper limits that exceeded EPA's limit of 1 ppm within the end product, "EPA never noticed this discrepancy," Wratten wrote in an internal email in 2010.[11]

112.    Wratten never told EPA about the "discrepancy" and he was not aware of anyone else at Monsanto doing so either. Wratten Tr. 171:6-172:4. EPA's pubic statements, including those as recently as in 2018 and 2021, indicate that, to date, EPA is unaware of the "discrepancy."

## V.    THE PRODUCTS ARE DEFECTIVE AND POSE AN UNREASONABLE SAFETY HAZARD.

113.    Glyphosate, whether it is in its pure form or mixed in a formulated product, is highly reactive when it comes in contact with nitrites.

114.    Every time a Product is exposed to nitrites or nitrosating agents, NNG is likely to form. The formation of NNG is linear—the greater exposure to nitrites or nitrosating agents, the more NNG will form. As Dr. Wratten, who holds a PhD in chemistry, explained: "It's a chemical reaction. If you put nitrite and glyphosate together, I think it's an equilibrium reaction, but nevertheless, it could form NNG." Wratten Tr. 154:1-4. Once nitrites are introduced to a glyphosate formulation, "the reaction between glyphosate and nitrate is fast and complete, and should occur early…" _Id_. 135:14-18.

115.    There are numerous ways whereby nitrites or nitrosating agents can be introduced to the Products, all of which are foreseeable, common uses of the Products. The most common

---

[11] https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents-2/email-between-heydens-and-wratten-discussing-nng-levels-in-glyphosate.pdf

exposures to nitrites or nitrosating agents are consistent with the labels' instructions; indeed, some are required to use the Product.

116.    For example, any time a consumer opens up a Product and exposes it to the air, NNG will form if nitrites in the air react with the Product. Nitrites are commonly present in air due to emissions from vehicles, lawn mowers, and industrial sources such as power plants.

117.    One of the most common places for consumers to store the Products is in their garage. Unfortunately, the garage is one of the worst places for nitrite exposure because car exhaust—a known source of nitrites—is often present there. Thus, when a consumer simply opens a Product in a garage if there is (and has been) car exhaust, which is likely, NNG forms.

118.    Another common source of nitrites is water because nitrites from fertilizers, waste, or minerals are often present in water. Because the Products are concentrated formulations, the Products' labels instruct consumers to mix them with water. NNG can form every time a consumer mixes a Product with water that has nitrites in it.

119.    Each exposure to nitrites causes more and more NNG to form, and NNG only increases over time.

120.    Other factors make NNG levels even worse. Heat is one. Storing the Products in a hot location, such as in a garage, shed or barn, accelerates NNG formation. Humidity also increases NNG formation. Time is another factor. Storing the Products for long periods of time also makes NNG worse within the Products.

121.    The Products, thus, share a common defect: their high concentrations of glyphosate degrade into uncontrollable and unlawful levels of NNG, even under ordinary conditions *when used in accordance with the Products' labels—i.e., as directed by Defendants*.

## VI.    MONSANTO CONCEALED THAT THE PRODUCTS' NNG LEVELS INCREASE TO ILLEGAL LEVELS AFTER MANUFACTURE.

122.    Monsanto has been aware for decades that external factors, like water, exhaust, heat, humidity, and long storage periods, cause NNG levels to increase in the Products post-manufacture to levels in excess of EPA limits.

123.    In 1997, for example, Monsanto tested one glyphosate-based product at the plant and found it had **_8 ppm_** after just 18 months in warehouse storage conditions and **_4 ppm_** after 18 months at room temperature. Despite this result, there was no requirement to test every lot for NNG at the time, or any effort to test formulations under real world aging conditions like the ones that generated a result over 8 times the legal limit. Further, Monsanto acknowledged at the time that that its dry formulations run closer to the 1 ppm at manufacture. Monsanto did not report the testing results to EPA.

124.    Later on, in February 2001, Monsanto tested samples of glyphosate for NNG and found levels of NNG at 1.4 ppm at the point of manufacture. Eric Haupfear, a Monsanto employee, who, upon information and belief, worked on process chemistry at the time, reacted: "Thanks for the result…but actually this **_IS NOT_** a good result" since the specification of the product was 1 ppm.[12]

125.    That afternoon, Mr. Haupfear emailed other Monsanto employees, stating "I wanted to ask everyone to please not forward the note below any further…" He claimed his response "could be interpreted as more 'alarming' than this really is" and he did not "want to start or imply an unnecessary fire drill."

126.    Mr. Haupfear conveniently wrote off the high levels of NNG as "related to things that are coming into our system with the GI or with the W-building water supply rather than the process itself" and recommended to "just monitor it over the next few weeks."

127.    Monsanto tried to control NNG formation by testing for nitrites in the water used to formulate the Products. However, it later discovered that NNG forms in glyphosate in other ways besides water during manufacture.

128.    Monsanto became aware, at least as of 2003, of an incident involving high levels of NNG in bags of glyphosate. At that time, Monsanto understood that exposure to "nitrogenous materials from exhaust fumes or other sources may seep into bags and cause NNG formation" in glyphosate products. Wratten Tr. 136:17-137:11. Dr. Wratten testified that the evidence was that

---

[12]https://www.baumhedlundlaw.com/assets/monsanto%20roundup%20pages/secret%20documents/Monsanto-Finds-Levels-of-N-ntirosoglyphosate-NNG-Exceed-the-Limit-of-1-ppm.pdf

"there had been some analysis of – of stored products in the warehouses" where "little tractors or trucks" were driven around "[a]nd maybe the NNG was somewhat higher than they thought it had been initially." *Id*.

129.    In an effort to understand NNG formation, Monsanto conducted a study dated October 5, 2004 that it also never provided to EPA or the public. The study, conducted by two of the patent holders for one of the Products, Monsanto employees Andrew Dyszlewski and Richard Kramer, was designed to measure formation of NNG in glyphosate and glyphosate formulations under a variety of conditions.

130.    The introduction of the study discusses the circumstances that prompted the study. It provides that "[d]uring a production campaign of QuikPro®, a dry glyphosate plus diquat mixture, *high levels of NNG (> 1.0 ppm) were reported in nearly all the production lots*" (emphasis added). The study goes on to say that "[a]t first it was believed that nitrite contamination was coming from a combustion source" but "[a]fter further investigation it was discovered that the source of contamination was the ammonium glyphosate (MON 8750) starting material" (i.e., one of QuikPRO's active ingredients). It was evident to Monsanto that "the MON 8750 was exposed to a nitrite source which was most likely combustion gases." The study further explained that additional samples taken from the MON 8750 inventory at the warehouse "showed a much more extensive problem." In fact, "*[n]early all the material was out of specification for NNG*", meaning it was all above 1 ppm NNG. (emphasis added).

131.    Monsanto definitively learned through the study that NNG forms readily in glyphosate upon contact with nitrites; so much so that it could "penetrate deep within a supersack of MON8750 given enough exposure time." In fact, samples taken in connection with the study reached levels as high as *80 ppm* (80 times over the legal limit). It further revealed that humidity greatly exacerbates the problem. The study also showed that surfactants, which are found in the Products, can increase NNG formation upon exposure to nitrites.

132.    The study also proved that the inert ingredient Monsanto uses to try to control NNG formation, sodium sulfite, readily degrades in the presence of humidity. It also proved that

sodium sulfite cannot keep NNG below 1ppm. In fact, samples tested with sodium sulfite were found to be over 1 ppm.

133.    Monsanto never sent the study or its results to EPA. It instead chose to withhold the study in an effort to continue illegally selling and distributing the Products.

134.    Monsanto had other internal discussions about the ways in which NNG increases in its glyphosate formulations. In 2003, in response to an email from a colleague about testing for NNG, Dr. Wratten wrote "[i]t is of course the NNG that concerns me." Wratten Tr.143:19-144:9. Dr. Wratten testified that the concern he had was with heat. The email chain, in fact, flags that "at a higher temperature, NNG might increase." *Id*. at 144:5-9.

135.    Dr. Wratten also knew that consumers who choose "to apply glyphosate in combination with fertilizers…might bring some nitrite into the mixture." *Id*. 141:3-7.

136.    Dr. Wratten even testified that exposure to water, which is requisite to the use of the Products, was another source of nitrites. He testified: "People also, of course, dissolve the formulated product in water for spraying. If the water comes from groundwater, and fertilizers or something have leached, you – you just don't know what might be in the groundwater. So you're adding materials to the formulation of unknown purity and composition." *Id*. 141:12-19.

137.    In agricultural areas, nitrogen-based fertilizers are a known major source of contamination for groundwater aquifers. *See* Dubrovsky, N.M., and Hamilton, P.A., 2010, Nutrients in the Nation's Streams and Groundwater: National Findings and Implications: U.S. Geological Survey Fact Sheet 2010, *available at* https://pubs.usgs.gov/fs/2010/3078/.

138.    By 2007, Monsanto and Scotts faced problems caused by high nitrite levels in water. On June 29, 2007, Lynn Boyd, a Monsanto employee, wrote an internal email stating, "With summer upon us, once again, Scotts is faced with increasing nitrite levels in their city water supply." Ms. Boyd chose to "issue a change in the spec to increase nitrite level[s]". She noted that Monsanto "[f]or the past two summers" has "been issuing spec waivers for nitrite" even though Scotts tended to see high levels of nitrites in the water it used to formulate the glyphosate products nitrite levels.

139.    Ms. Boyd proposed permanently changing the specifications for nitrite in formulation water at Scotts and reached out to Dr. Wratten to get his thoughts "from a registration perspective." Dr. Wratten explained "I do think this is important, because the nitrite level is linked to NNG, which a legal limit." He went on to say, "Since I think the reaction between nitrite and glyphosate is complete and instantaneous, and glyphosate is not limiting, for every unit of nitrite in the water, there is a roughly 4-times higher concentration of NNG produced." He recommended "maintain[ing] our standards" but noted that "[p]ractically speaking, I'm pretty sure nobody is looking at this in products on the shelf, and it has been a very quiet issue for at least 15 years."

140.    More egregiously, of April 2008, Monsanto itself did not appear to even have a firm grasp on how much NNG was in the Products, including *before* they were distributed to retailers.

141.    In an email chain from April 2008, Monsanto employees discussed different techniques competitors used to avoid impurities like NNG from forming during manufacture.[13] A Monsanto employee, advised other Monsanto employees, including Donna Farmer, William Heydens, Annette Kirk, and Stephen Waters, that "No 'route' really avoids NNG, since it is formed inadvertently directly from glyphosate, in the presence of nitrosating agents. If glyphosate is present, so may NNG be. Such nitrosating substances may occur from different reagent batches, shipping containers, water, etc." The employee conceded that while Monsanto "might say our route avoids NNG" because Monsanto checks for impurities in the water used for the products, it still forms. The employee then advised: "The only way to know for sure is to measure NNG in many batches over time and convince yourself empirically that [it] does not exceed your detection sensitivity or the legal 1 ppm limit."

142.    On May 4, 2010, Dr. Wratten again raised problems with NNG. In an email to William Heydens, a Monsanto toxicologist, and Russell Schneider, a senior regulatory advisor for Monsanto, Dr. Wratten wrote: "NNG is an undesired and inadvertent contaminant that arises

---

[13] https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents-2/mongly02530964-mongly02530966_redacted.pdf

when glyphosate is exposed to a 'nitrosating material,' such as sodium nitrite. It can arise during manufacturing of the AI [active ingredient], but also post-production environments such as formulation components (including the water!) or even exposure of dry glyphosate to diesel exhaust."[14]

143.   In the same email thread, Dr. Wratten acknowledged that NNG's "level is not fixed at the time of acid manufacture, but instead is greatly impacted by subsequent formulation and handling steps." *Id*. He added "[b]ecause of these facts, it is also easily contaminated during sampling and analysis, and all high results need to be investigated and verified." *Id*.

144.   In July 31, 2015, John Acquavella, a former Monsanto employee and paid epidemiology consultant at the time, asked Donna Farmer in an email whether "glyphosate [is] really nitrosable" and if NNG is "judged likely to be an animal human carcinogen."[15]

145.   In response, Dr. Farmer acknowledged that it was, in fact, nitrosable. *Id*. She additionally wrote that regulators like EPA "do not require special testing or risk assessment if the levels are at 1 ppm or lower." *Id*. She then admitted that "***Monsanto therefore prefers to carefully control against NNG formation rather than to engage in scientific debate around its biological activity***" even though in the same email she admitted that "nitrosating agents" can arise "during or after manufacture." *Id*. (emphasis supplied).

146.   More fundamentally, Monsanto knew that, once the Products reached consumers, there was nothing it could do to control against NNG formation, no matter what efforts the company took to keep the levels down during manufacture because glyphosate is inherently reactive with nitrites. Yet, it did nothing to inform consumers, EPA, or other regulators about the inherent risks of the Products. It did not add an expiration date to the Products via notification process. To the contrary, it did nothing.

---

[14] https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents-2/email-between-heydens-and-wratten-discussing-nng-levels-in-glyphosate.pdf
[15] https://www.baumhedlundlaw.com/assets/monsanto%20roundup%20pages/secret%20documents/Internal-Email-from-Donna-Farmer-Monsanto-Would-Rather-Keep-Roundup-NNG-Levels-Below-1ppm-Rather-Than-Debate-Biological-Activity.pdf

147.    Indeed, despite all of their knowledge, and awareness of how consumers use and store the Products, including as directed by Defendants, Defendants never reported any of the evidence of unlawful levels of NNG to EPA. To this day, Monsanto has withheld this information from consumers, EPA and state regulatory entities nationwide.

## VII.    MONSANTO ACTIVELY CONCEALED THE SAFETY HAZARDS WITH THE PRODUCTS FROM REGULATORS AND CONSUMERS ALIKE.

148.    Internally, Monsanto was deeply worried about what it might find if it tested older Products in the field, even though testing older products would inform Monsanto about the levels of NNG within the Products consumers use, and thus are exposed to, in the real world.

149.    On January 13, 2003, Dr. Wratten wrote: "[f]ormation of NNG on aging of the formulation is one topic we have avoided carefully" and admitted that Monsanto's U.S. business never received an NNG aging study. Wratten Tr. 133:1-5.

150.    When asked why Monsanto avoided the topic, Dr. Wratten admitted that Monsanto simply did not want to know how much NNG was in the Products when consumers used them. He testified: "It's one of those things that you can't ever finish, because imagine we aged it for a year and everything was fine. Then someone says, Well, what about two years, or what about five years. And it's -- once you start down that path, I don't see the end to it." *Id*. at 133:6-13. Monsanto, of course, knew that consumers in the real world store the Products for years. *Id*. at 133:14-18.

151.    Instead of testing, Monsanto did the exact opposite; it intentionally avoided testing, for fear of the results. Dr. Wratten wrote, in that same January 13, 2003 email: "[t]here is a lingering concern about aged samples of dry products… *I would avoid sampling long-aged dry product from retail*." *Id*. at 136:6-11 (emphasis added).

152.    When asked why he would avoid sampling long-aged dry product from retail, Wratten explained that Monsanto does not sample products from consumers because there are too "many variables." *Id*. 137:16-138:3. He would "avoid it just because you might find differences from when it was manufactured." *Id*. He conceded, with respect to NNG, "you might find more [NNG] than you started with." *Id*. at 138:6-7. Sampling long-aged dry product from

retail also "***might result in you having to recall a bunch of product***." *Id*. at 138:18-139:2 (emphasis supplied).

153.    When asked directly if Monsanto would have to recall product that had more than 1 ppm of NNG, he said "***yes***." *Id.* (emphasis supplied).

154.    Dr. Wratten remained concerned about high levels of NNG in consumers' Products seven years later. In 2010, he wrote "it is a real concern that even our own material that was okay at the production plant could have higher levels later when sampled in the field." *Id*. at 154:5-9. Wratten testified that by "real concern" he meant "it's a real concern relative to the 1 ppm limit." *Id*. at 154:15-17. At that time, he again reiterated that NNG could arise during the manufacture of the active ingredient but also in "post-production environments" like adding water or exposure to diesel. *Id*. at 153:10-18.

155.    To date, Monsanto has not tested samples of aged products from retail.

156.    Despite knowing the problems with Products out "in the field" (i.e., with consumers), Defendants nonetheless sold and distributed the Products in quantities that are not designed for a single use with one exception of which Plaintiffs are aware;[16] rather, the rest of the Products are marketed as bulk items designed to be used over multiple occasions and stored over long periods of time. QuikPRO, for instance, comes in a 6.8 lb jug but the label recommends mixing only 1.2 to 1.5 ounces of the Product to get 1 gallon of mixed herbicide. One jug alone makes ***72 gallons*** of spray solution—more than a residential user would likely spray in an entire lifetime. Given that it can take up to a year for weeds to grow back after area has been sprayed, it can easily take consumers more than a year to use the entire bottle of QuikPRO. The same is true for all of the other Products sold in quantities at or above a gallon, which are specified on Exhibit 1.

157.    In choosing to manufacture, market, sell and distribute the Products in large quantities, Defendants knew (or, at a minimum, should have known) that consumers would use the Products for multiple sprays over time. In doing so, they also knew that the Products would

---

[16] The exception is QuikPRO which is also sold in a 6.8 lb jug and in packets of 5 of 1.5 oz each.

almost invariably get more dangerous with each use. Not only would it increase the likelihood of exposure to nitrites, but age, humidity, hot temperatures and other exposures would lead to even more, unsafe levels of NNG in the Products.

158.    In short, Defendants prioritized profits over its customers' safety, despite knowledge of the dangers of exposure to NNG in the Products. Simply put, Defendants did not want to recall Product or risk a fire drill; instead, they elected to hide the truth from everyone.

159.    To date, Bayer AG, speaking on behalf of Monsanto and Bayer CropScience, insists that "[b]oth we and the relevant regulatory authorities continue to believe there are no safety concerns in connection with these products." *See* Bayer 2021 Annual Report, p. 72.

160.    In the wake of trial losses in personal injury cases alleging that Roundup causes cancer, Monsanto and Bayer AG issued a series of statements assuring the public about the safety of its products, even though, at the time, it knew that glyphosate was prone to developing a presumably carcinogenic nitrosamine.

161.    On August 16, 2018, Bayer AG told the public, "Bayer believes that the jury's decision is at odds with the weight of scientific evidence, decades of real world experience and the conclusions of regulators around the world that all confirm glyphosate is safe and does not cause non-Hodgkin's lymphoma."[17]

162.    On August 23, 2018, Bayer AG held a conference call to discuss the Roundup litigation. Werner Baumann, Bayer AG's Chief Executive Officer, told investors that the verdict is "completely inconsistent with all available facts," because Roundup was in "very good regulatory standing" and there was "strong science supporting" glyphosate's safety.[18]

163.    Bayer AG reiterated this concept in October 2018 after it lost the *Johnson* trial. It assured consumers that "[g]lyphosate-based herbicides have been used safely and successfully for over four decades worldwide." It based this assertion on the supposed "extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 rigorous

---

[17] https://media.bayer.com/baynews/baynews.nsf/id/Bayer-Conditions-for-beginning-Monsanto-integration-fulfilled

[18] https://www.bayer.com/sites/default/files/2020-11/ConferenceCall_2018-08-23_Transcript.pdf

registration studies required by EPA, European and other regulators" that allegedly "confirm[] that these products are safe when used as directed."[19] But, at the time Bayer AG issued that statement, its subsidiaries, Monsanto and Bayer CropScience, knew that EPA did not have critical information about the inability to control NNG formation post-manufacture or the so-called "discrepancy" regarding the elevated levels of NNG in the Products – information that would have revealed the safety hazards posed by the Products.

164.    To date, Bayer AG maintains a webpage for Monsanto and Bayer CropScience titled "Glyphosate is Safe" but does not mention anywhere that glyphosate is, by its nature, highly reactive to nitrites to form NNG, which poses a serious threat to consumers' safety in using the Products.[20]

## VIII.    FIFRA REQUIREMENTS ON LIMITS OF IMPURITIES.

165.    FIFRA governs the sale, distribution and use of pesticides in the United States and establishes a federal registration framework that prohibits the distribution or sale of any unregistered pesticides. 7 U.S.C. § 136a(a). Specifically, Section 136a(a) provides "[e]xcept as provided by this subchapter, no person  in any State may distribute or sell to any person any pesticide that is not registered under this subchapter." *See also* 7 U.S.C. § 136j(a)(1)(A) ("it shall be unlawful for any person in any State to distribute or sell to any person – (A) any pesticide that is not registered under section 136a of this title…").

166.    FIFRA defines the term "pesticide" to include "any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant." 7 U.S.C. § 136(u)(2). The Products are pesticides because they are herbicides intended to kill weeds.

167.    One of the factors EPA evaluates during the registration process is whether the pesticide "will not cause unreasonable adverse effects on humans and the environment." *Bates v. Dow Agrosciences*, 544 U.S. 431, 438 (2005). *See also* 7 U.S.C. § 136a(c)(5)(C), (D), §§ 136(bb).

---

[19] https://www.bayer.com/en/glyphosate/is-glyphosate-safe
[20] *Id.*

168.    FIFRA defines "unreasonable adverse effects" to include "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. 136(bb).

169.    A product's registration under FIFRA establishes the terms and conditions under which that product may be lawfully sold, distributed, and used. *See* 7 U.S.C. § 136j(a)(1)(A); *see also* 7 U.S.C. §§ 136a(c)(1)(A)-(F), 136a(c)(5) and 136a(d)(1).

170.    California also requires manufacturers to register herbicides that are sold in the state with the Department of Pesticide Regulation. Specifically, Cal. Food & Agric. Code § 12811 provides that "[e]very manufacturer of, importer of, or dealer in any pesticide…shall obtain a certificate of registration from the department before the pesticide is offered for sale." Cal. Food & Agric. Code § 12993 further provides that "[i]t is unlawful for any person to manufacture, deliver, or sell any pesticide or any substance or mixture of substances that is represented to be a pesticide…which is not registered pursuant to this chapter…" Only EPA-approved herbicides may be sold and registered in California.

171.    As part of the federal registration process, applicants must certify the chemical composition of the product, including limits on ingredients and impurities like NNG.[21]  *See* 41 C.F.R. §158.350. As to nitrosamines specifically, EPA has stated applicants "must certify the upper limit of the N-nitroso compound in his Confidential Statement of Formula for all products containing a positive level of N-nitroso contaminant." 45 Fed. Reg. 42856.

172.    The limits "become legally binding limits upon approval of the application" and apply "to the product from the date of production to date of use." 41 C.F.R. §158.350. In other words, certified limits define the precise contours of the product pesticide manufacturers are authorized to sell.

---

[21] EPA defines "impurity" to mean "any substance (or group of structurally similar substances if specified by the Agency), in a pesticide product other than an active ingredient or an inert ingredient, including unreacted starting materials, side reaction products, contaminants, and degradation products." 41 C.F.R. §158.300.

173.    Applicants and registrants can shorten the applicable timeframe of the limits by putting "a statement prohibiting use after a certain date" at which point "the certified limits will apply only until that date." 41 C.F.R. §158.350.

174.    However, if an applicant or registrant declines to put "a statement prohibiting use after a certain date" on the product, then an impurity within an herbicide can ***never*** exceed its certified limit. In such circumstances, if an impurity exceeds its certified limit ***at any point in time***, the herbicide is and has always been unregistered and is illegal to sell or distribute.

## IX.    DEFENDANTS UNLAWFULLY SOLD AND DISTRIBUTED UNREGISTERED HERBICIDES.

175.    The upper certified limit for NNG in each of the Products is 1 ppm. The upper certified limit is a binding part of each Products' registration.

176.    At all times relevant hereto, none of the Products contained a statement prohibiting use after a certain date.

177.    Defendants sold and distributed the Products knowing that consumers' ordinary use of the Products would invariably introduce nitrites and thereby cause NNG to form at levels in excess of its certified limit of 1 ppm. Because the Products' certified limits, upon which the Products' registrations with EPA are based, do not allow the Products to have over 1 ppm NNG *at any point in time* since the Products do not include a statement prohibiting use after a certain date, the Products are and have always been unregistered pesticides and violate 41 C.F.R. §158.350. The sale and/or distribution of the Products was also prohibited because the Products' chemical composition differed at the time of their sale or distribution from what was allowed under their Confidential Statement of Formula. None of the Products' Confidential Statements of Formula permit NNG to exceed 1 ppm at any point in time during the Products' life cycle. The Products, however, can and invariably do exceed 1 ppm NNG even when used and stored in accordance with the labels.  Accordingly, Defendants never had a right to sell or distribute the Products, and Defendants' sale and distribution of the Products was illegal in violation of FIFRA, including but not limited to:

a. 7 U.S.C. § 136a(a) ("no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter);

b. 7 U.S.C. § 136j(a)(1)(A) ("it shall be unlawful for any person in any State to distribute or sell to any person— (A) any pesticide that is not registered under section 136a of this title or whose registration has been canceled or suspended, except to the extent that distribution or sale otherwise has been authorized by the Administrator under this subchapter");

c. 7 U.S.C. § 136j(a)(1)(C) ("it shall be unlawful for any person in any State to distribute or sell to any person— (C) any registered pesticide the composition of which at the time of its distribution or sale from its composition as described in the statement required in connection with registration under section 136a of this title");

d. 7 U.S.C. § 136j(a)(1)(E) ("it shall be unlawful for any person in any State to distribute or sell to any person—(E) any pesticide which is adulterated or misbranded");

e. 7 U.S.C. § 136(q)(1)(C) (a pesticide is misbranded if "it is an imitation of, or is offered for sale under the name of, another pesticide");

f. 7 U.S.C. § 136j(a)(2)(S) ("It shall be unlawful for any person—to violate any regulation issued under section 136a(a) or 136q of this title").

178.   Defendants' sale and distribution of the Products was also illegal in violation of parallel requirements under California law, including but not limited to:

a. Cal. Food & Agric. Code § 12811 ("[e]very manufacturer of, importer of, or dealer in any pesticide…shall obtain a certificate of registration from the department before the pesticide is offered for sale");

b. Cal. Food & Agric. Code § 12881(c) (a pesticide is misbranded if it "it is an imitation of, or offered for sale under the name of, another article");

c. Cal. Food & Agric. Code § 12991(c) (it is unlawful for any person in connection with a pesticide to "[e]ngage in illegitimate business or dishonest dealing");

d. Cal. Food & Agric. Code § 12992 ("[i]t is unlawful for any person to sell any adulterated or misbranded pesticide"); and

e. Cal. Food & Agric. Code § 12993 ("[i]t is unlawful for any person to manufacture, deliver, or sell any pesticide or any substance or mixture of substances that is represented to be a pesticide…which is not registered pursuant to this chapter…")

## X.   DEFENDANTS UNLAWFULLY SOLD AND DISTRIBUTED MISBRANDED HERBICIDES.

179.   The California Food & Agricultural Code and FIFRA further prohibit the sale or distribution of pesticides that are "misbranded." Section 136j(a)(1)(E) of FIFRA provides that "it shall be unlawful for any person in any State to distribute or sell to any person—(E) any pesticide which is adulterated or misbranded." Section 12991 of Cal. Food & Agric. Code also provides that "[i]t is unlawful for any person to sell any adulterated or misbranded pesticide".

180.   A pesticide is misbranded under FIFRA if its labeling "bears any statement… which is false or misleading in any particular," 7 U.S.C. 136(q)(1)(A) and 40 C.F.R. § 156.10(a)(5), or if "it is an imitation of, or is offered for sale under the name of, another pesticide," 7 U.S.C. § 136(q)(1)(C).

181.   California has parallel requirements that provide that a pesticide is misbranded if "[i]t is labeled or branded so as to deceive or mislead the purchaser", Cal. Food & Agric. Code § 12881(d), or "it is an imitation of, or offered for sale under the name of, another article," Cal. Food & Agric. Code § 12881(c). California also has further misbranding provisions that parallel FIFRA and provide:

a. Cal. Food & Agric. Code § 12881(a) (a pesticide is misbranded if "[t]he package or label bears any false or misleading statement, design, or device regarding the article or any ingredient or substance that is contained in it");

b. Cal. Food & Agric. Code § 12882(b) (a pesticide is misbranded if "[t]he contents of the package are of a quality below that of the guarantee on the label, on the application for registration of the pesticide, or of the analysis of the representative

sample delivered in connection with the application for registration of

the pesticide");

c. Cal. Food & Agric. Code § 12991(a) (it is unlawful for any person in connection with a pesticide to "[m]ake any material or substantial misrepresentation");

d. Cal. Food & Agric. Code § 12991(b) (it is unlawful for any person in connection with a pesticide to "[m]ake any false promises of a character likely to influence, induce, or deceive");

e. Cal. Food & Agric. Code § 12991(c) (it is unlawful for any person in connection with a pesticide to "[e]ngage in illegitimate business or dishonest dealing");

f. Cal. Food & Agric. Code § 12992 ("[i]t is unlawful for any person to sell any adulterated or misbranded pesticide"); and

g. Cal. Food & Agric. Code § 12993 ("[i]t is unlawful for any person to manufacture, deliver, or sell any pesticide or any substance or mixture of substances that is represented to be a pesticide…which is not registered pursuant to this chapter…")

182.    Defendants falsely sold and/or distributed the Products under the guise that they were registered, approved by EPA, and legal to sell. In reality, the Products' true chemical compositions are not and never have been registered, approved by EPA, or legal to sell, as explained above. The Products are, therefore, imitations of registered pesticides and falsely, unlawfully, and unfairly offered for sale under the name of registered pesticides.

183.    By marketing, selling, and distributing the Products under the names of registered pesticides, Defendants misled consumers into believing they were buying EPA-approved herbicides that are registered and legal to sell when, in fact, they were not. Reasonable consumers believe when they see the name of a Product like "Roundup QuikPRO Herbicide" or "Roundup Weed & Grass Killer Super Concentrate" that they are buying a product that is chemically equivalent to the herbicides EPA approved to be sold as "Roundup QuikPRO Herbicide" or "Roundup Weed & Grass Killer Super Concentrate" respectively. In reality, the chemical composition within each Product, however, is not approved by EPA and is not

registered because the Products invariably form unlawful levels of a presumptive carcinogen, NNG. Because EPA did not approve the Products' true chemical composition, Defendants' sale, distribution and marketing of the Products deprived consumers of the benefit of EPA's safety assessment. This information was material to consumers because it is a safety hazard for consumers.

184.     Defendants' marketing, sale and/or distribution of the Products accordingly was unlawful, misleading and unfair and violated FIFRA and parallel requirements under the Cal. Food & Agric. Code, including: Cal. Food & Agric. Code § 12881(a), (c), (d), 12882 (b), 12991(a), (b), (c), 12992 and 12993.

## XI.    DEFENDANTS UNLAWFULLY FAILED TO PUT A "NOT FOR SALE OR USE AFTER [DATE]" ON THE PRODUCTS.

185.     EPA specifically requires pesticide manufacturers to put a "Not for sale or use after [date]" in certain circumstances. Specifically, when "a pesticide formulation changes chemical composition significantly," the product "must bear the following statement in a prominent position on the label: 'Not for sale or use after [date].'" 40 C.F.R. § 156.10(g)(6). The product must comply with the certified limits for impurities up to the expiration time indicated on the label. *See* 40 C.F.R. § 156.10(g)(6)(ii); 41 C.F.R. §158.350.

186.     FIFRA defines "label" to mean "the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers." 7 U.S.C. § 136(p)(1).

187.     Defendants knew the Products changed in chemical composition over time through the ordinary use of the Products, which invariably exposes the formulation to nitrites and causes NNG to form at levels exceeding permissible limits.

188.     The change in chemical composition in the Products due to an increase in NNG is significant because NNG is an impurity of toxicological significance and it develops at levels exceeding the certified limits approved by EPA and the limit at which EPA has determined NNG poses a serious risk to human health and is presumed to be carcinogenic.

189.     Indeed, EPA caps NNG at 1 ppm in glyphosate-based products. EPA also presumes that nitrosamines like NNG are carcinogenic unless a manufacturer provides acceptable

oncogenic testing that establishes the particular nitrosamine is not carcinogenic in accordance with EPA's June 26, 1980 policy, which is required when a manufacturer finds evidence of levels of NNG over 1 ppm. Monsanto has never provided EPA with oncogenic testing that EPA deemed to be acceptable to establish that NNG is not carcinogenic, and, according to EPA's own statements, neither have any of the other Defendants.

190.     Because Defendants knew the Products are highly reactive with nitrites and consumers' ordinary use of the Products would likely cause NNG to form in excess of permissible levels, they were required to put a "Not for sale or use after [date]" on the Products' labels. Defendants' failure to do so violates 40 C.F.R. § 156.10(g)(6).

191.     Defendants had a duty to disclose the "Not for sale or use after [date]" pursuant to 40 C.F.R. § 156.10(g)(6). They also had a duty to disclose the "Not for sale or use after [date]" because Defendants had exclusive knowledge about the reactivity of the Products when exposed to nitrites and the circumstances in which the Products develop NNG. The information was material because the Products' reactivity with nitrites poses a safety hazard to consumers since nitrosamines are known carcinogens. Consumers, including Plaintiffs, have no ability to know this information themselves because testing is not readily available, and Defendants actively concealed this information from Plaintiffs, those similarly situated, EPA, and the general public. Further, when a product does not include an expiration date, reasonable consumers are led to believe that a product is safe to use until they finish using the entirety of the product, which can take well over a decade. They also assume that the Product will not develop unlawful levels of a presumptive carcinogen as they use the Product.

192.     Defendants' failure to include a "Not for sale or use after [date]" on the Products misled consumers as to the time frame in which they could safely use the Products and created a safety hazard for consumers since in the absence of a "Not for sale or use after [date]," consumers may unknowingly use and expose themselves to a Product that has unlawfully high levels of NNG, a presumptive carcinogen.

193.     Monsanto, Bayer CropScience and Seamless Control easily could have added a "Not for sale or use after [date]" to the Products through the notification process in accordance

with PR Notice 98-10 and 40 C.F.R. § 152.46, as EPA has allowed other manufacturers, like A-dec, Inc., to do.[22] *See Hardeman v. Monsanto Co.*, 997 F. 3d 941, 960-1 (9th Cir. 2021) ("Though Monsanto contends that '[a]dding a warning about cancer would hardly qualify as a 'minor modification,'' EPA has repeatedly permitted pesticide manufacturers to use the notification procedure to add notices related to cancer to their products' labels.")

194.    Instead, Monsanto, Bayer CropScience, and Seamless Control knowingly sold (and Monsanto and Bayer CropScience continue to sell) the Products without informing consumers as to the applicable "Not for sale or use after [date]" on the Products' labels in violation of federal and California law, even though that is exactly where a reasonable consumer would look for such information.

195.    What's worse, Monsanto has acknowledged that some of the Products have a shelf life or expiration date but has failed to include this information on the Products' labels where it is legally required to put it and where it would be most obvious to consumers. For example, the Material Safety Data Sheets (MSDS) for some of the Products identify a specified shelf life. For instance, the MSDS for Roundup PRO Concentrate Herbicide effective May 25, 2015 issued by Monsanto ("2015 MSDS") discloses that its "[r]ecommended maximum shelf life:" is "2 years." *See* Exhibit 24 (May 29, 2015 MSDS for Roundup PRO Concentrate Herbicide).

196.    Bayer CropScience later issued a version of the MSDS for the Roundup PRO Concentrate Herbicide in 2020 without that disclosure. *See* Exhibit 25 (August 12, 2020 MSDS for Roundup PRO Concentrate Herbicide).

197.    The older 2015 MSDS does not lawfully disclose an expiration date to consumers. First, the 2015 MSDS – and all the other MSDS's – do not qualify as "labels" under FIFRA because the MSDS does not come "attached to" the Products themselves. Nor are they included with the Products when purchased off-the-shelf from a retailer. Indeed, the rule requires placement of the "Not for sale or use after [date]" "in a ***prominent*** position ***on the label***" so that consumers can and will see the date every time they use it. 40 C.F.R. § 156.10(g)(6) (emphasis

---

[22] A-Dec, Inc. is a manufacturer that added an expiration date via the notification process. *See* https://www3.epa.gov/pesticides/chem_search/ppls/079662-00001-20110915.pdf

added). The point of the expiration date is to prevent consumers from using the Products after a certain time period. An expiration date that is buried in an MSDS, does not come attached to the Product, and is not *prominently* featured on the label defeats the point of this requirement. It is, however, evidence that Defendants knew the Product should have been marketed and sold with a clearly stated shelf life or expiration date.

198.    Setting aside that it is atypical for consumers to even see the MSDS, reasonable consumers could see the MSDS and still reasonably believe they could safely use the Products after 2 years since they do not explicitly tell consumers not to *use* the product after a certain date. In fact, the 2015 MSDS for Roundup PRO Concentrate Herbicide expressly disclaims that it applies to consumer use of the Product and states the consumer should, instead, rely on the label for such purposes. Specifically, it states:

> This Material Safety Data Sheet (MSDS) serves different purposes than and DOES NOT REPLACE OR MODIFY THE EPA-APPROVED PRODUCT LABELING (attached to and accompanying the product container). This MSDS provides important health, safety, and environmental information for employers, employees, emergency responders and others handling large quantities of the product in activities generally other than product use, while the labeling provide information specifically for product use in the ordinary course. Use, storage, and disposal of pesticide products are regulated by the EPA under the authority of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) through the product labeling, and ***all necessary and appropriate precautionary use, storage, and disposal information is set forth on that labeling.*** It is a violation of federal law to use a pesticide product in any manner not prescribed on the EPA-approved label.

2015 MSDS (emphasis added).

199.    The 2015 MSDS for Roundup PRO Concentrate Herbicide also contains representations that conceal the safety hazard posed by the products' propensity to react with nitrites and develop NNG. It provides that the product is "[s]table under normal conditions of handling and storage." Further, the section relating to the "[p]ossibility of hazardous reactions" does not disclose reactions with nitrites, or warnings to keep the product away from sources of nitrites.

200.    Similarly, the 2003 MSDS for the Roundup Weed & Grass Killer Super Concentrate provides that "shelf life" is "currently under test" but then recommends a 2-year shelf

life. Monsanto removed the reference to the shelf life in subsequent MSDSs for the Roundup Weed & Grass Killer Super Concentrate.

201.    The Products' failure to include a "Not for sale or use after [date]" was unlawful and renders them misbranded in violation of FIFRA and the regulations promulgated pursuant to it, including, but not limited to:

a.    7 U.S.C. § 136(q)(1)(E) (a pesticide is misbranded if "any word, statement, or other information required by or under authority of this subchapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use");

b.    7 U.S.C. § 136j(a)(1)(E) ("it shall be unlawful for any person in any State to distribute or sell to any person—(E) any pesticide which is adulterated or misbranded"); and

c.    40 C.F.R. § 156.10(a)(5) (a pesticide is misbranded "if its labeling is false or misleading in any particular including both pesticidal and non-pesticidal claims").

202.    Defendants' sale and distribution of the Products was unlawful and violates the California Food & Agricultural Code, including, but not limited to:

a.    Cal. Food & Agric. Code § 12881(a) (a pesticide is misbranded if its package or label bears any false or misleading statement, design, or device regarding the article or any ingredient or substance that is contained in it);

b.    Cal. Food & Agric. Code § 12881(d) (a pesticide is misbranded if it is labeled or branded so as to deceive or mislead the purchaser);

c.    Cal. Food & Agric. Code § 12991 ("It is unlawful for any person, individually or through another, in connection with [a pesticide]… to (a) Make any material or substantial misrepresentation. (b) Make any false promises of a character likely to influence, induce, or deceive. (c) Engage in illegitimate business or dishonest dealing…"); and

d.   Cal. Food & Agric. Code § 12992 ("[i]t is unlawful for any person to sell any adulterated or misbranded pesticide").

## XII.   PLAINTIFFS' EXPERIENCES

### A.   Scott Koller

203.   Plaintiff Scott Koller is a consumer who is interested in herbicide products to control weeds. He purchased Roundup Weed & Grass Killer Super Concentrate on several occasions from Lowe's, Ace Hardware, and Home Depot stores in the Brentwood, California and Antioch, California areas in the last decade, including at least two over the last four years. Mr. Koller typically used the Product over the course of a year or two.  He stored the Product in his garage or, during the summer, outside in his yard next to his lawn mower or in an adjacent plastic shed. Each location—his garage, side yard and plastic shed—are not temperature controlled, and all reach well over 100 degrees Fahrenheit in summer.

204.   Mr. Koller made each of his purchases after reading and relying on the truthfulness of the Roundup Weed & Grass Killer Super Concentrate label, which among other things, promised the Product contained "Roundup Weed & Grass Killer Super Concentrate" as registered with EPA. Mr. Koller believed the truth of the representation, i.e., that the Product was chemically identical to the "Roundup Weed & Grass Killer Super Concentrate" registered with EPA. The label also led him to believe that the Product contained a registered, EPA-approved herbicide. But, as explained above, the Product is not "Roundup Weed & Grass Killer Super Concentrate" as registered with EPA because the registered "Roundup Weed & Grass Killer Super Concentrate" can never exceed 1 ppm NNG at any point in time. The Products, by contrast, have a different chemical composition that enables them to develop NNG far in excess of the 1 ppm legal limit. EPA never approved or registered the Products' true chemical compositions. Had Mr. Koller known the truth, Mr. Koller would not have purchased the Roundup Weed & Grass Killer Super Concentrate.

205.   Further, Mr. Koller made each of his purchases after reading and relying on the truthfulness of the Product's label, which did not include "Not for sale or use after [date]." Because there was not a "Not for sale or use after [date]" disclaimer on the Roundup Weed &

Grass Killer Super Concentrate, he believed that it could be used for an indefinite duration when used and stored in accordance with the label. When Mr. Koller bought the Roundup Weed & Grass Killer Super Concentrate, he did not see an expiration date or a "Not for sale or use after [date]." Had there been an expiration date, he would have noticed it. The length of time in which he could use the Roundup Weed & Grass Killer Super Concentrate was important to him because it comes in a large quantity, and it typically takes him a year or more to use all of it. Had Defendants complied with the law, and put a "Not for sale or use after [date]" instruction on the Product's label, he would not have been drawn to the Product and would not have purchased it. At a minimum, he would have paid less for each Product. Indeed, the Products are worth less to consumers since the Products do not last for an indefinite duration, but, rather, can be used only for a limited period of time, if at all.

206.    In addition, at the time of each of Mr. Koller's purchases of the Roundup Weed & Grass Killer Super Concentrate, he was not aware that it was defective because it was substantially likely to develop uncontrollable and unlawful levels of a presumptive carcinogen, even with use and storage consistent with the label. This information was material to Mr. Koller because it concerns his safety in using the Products. Mr. Koller would not have purchased the Products or would not have paid as much for them if he had known of the defect with the Products.

207.    Mr. Koller continues to want to purchase products that control weeds, including Roundup Weed & Grass Killer Super Concentrate and other Products the Defendants manufacture, distribute or sell. He regularly visits online and brick and mortar stores where the Products are sold. Without purchasing and having the Products professionally tested or consulting scientific and regulatory experts, Mr. Koller will be unable to determine if representations that Defendants make regarding the properties and features of the Products are true and complete or the length of time in which he can safely use the Products. Because Mr. Koller does not know the formula for the Products, which can change over time, and cannot test whether the Products change in chemical composition over time and degrade into unlawful levels of NNG without first purchasing a Product, Mr. Koller will be unable to rely on the Products' labels when shopping for herbicide products in the future absent an injunction that requires Monsanto and Bayer

CropScience to add a "Not for sale or use after [date]" direction to the Products' labels via EPA's notification process. In addition, at present Mr. Koller cannot rely on the accuracy of Monsanto's and Bayer CropScience's labels for the entire line of glyphosate products, including glyphosate products that have more than 40% glyphosate, which Mr. Koller is also interested in purchasing with labeling that comports with regulations. Should Monsanto or Bayer CropScience begin to market and sell a new line of products, Mr. Koller could also be at risk for buying another one of their products in reliance on the same or similar misrepresentation and omissions. And because of unlawful and misleading labels on the Products, Mr. Koller cannot make informed choices between the herbicides offered by Monsanto and/or Bayer CropScience and herbicides offered by other manufacturers, such as choices based on price and length of time in which the product is suitable for consumer use.

**B. Tim Ferguson**

208.    Plaintiff Tim Ferguson is a consumer who is interested in herbicide products. He purchased QuikPRO packets from Tractor Supply in Ripon, California on or around September 2021. He has stored the Product in the back of his truck where it can get very hot.

209.    Mr. Ferguson made his purchase after reading and relying on the truthfulness of the QuikPRO label, which among other things, promised the Product contained "Roundup QuikPRO Herbicide" as registered with EPA. Mr. Ferguson believed the truth of the representation, i.e., that the Product was chemically identical to the "Roundup QuikPRO Herbicide" registered with EPA. The label also led him to believe that the Product contained a registered, EPA-approved herbicide. But, as explained above, the Product is not "Roundup QuikPRO Herbicide" as registered with EPA because the registered "Roundup QuikPRO Herbicide" can never exceed 1 ppm NNG at any point in time. The Products, by contrast, have a different chemical composition that enables them to develop NNG far in excess of the 1 ppm legal limit. EPA never approved or registered the Products' true chemical composition.  Had Mr. Ferguson known the truth, he would not have purchased the QuikPRO.

210.    Further, Mr. Ferguson made purchase after reading and relying on the truthfulness of the Product's label, which did not include "Not for sale or use after [date]."  Because there was

not a "Not for sale or use after [date]" disclaimer on the Products, he believed that QuikPRO could be used for an indefinite duration when used and stored in accordance with the label. When Mr. Ferguson bought the QuikPRO, he did not see an expiration date or a "Not for sale or use after [date]." Had there been an expiration date, he would have noticed it. The length of time in which he could use the QuikPRO was important to him because he did not plan to use all the packets in one use and intended to store unused packets for use even possibly years later. Had Defendants complied with the law, and put a "Not for sale or use after [date]" disclosure on the Product's label, he would not have been drawn to the Products and would not have purchased them. At a minimum, he would have paid less for each Product. Indeed, the Products are worth less to consumers since the Products do not last for an indefinite duration, but, rather, can be used only for a limited period of time, if at all.

211.    In addition, at the time of Mr. Ferguson's purchase of the QuikPRO, he was not aware that it was defective because it was substantially likely to develop uncontrollable and unlawful levels of a presumptive carcinogen, even with use and storage consistent with the label. This information was material to Mr. Ferguson because it concerns his safety in using it. Mr. Ferguson would not have purchased the QuikPRO or would not have paid as much for it if he had known of the defect with the Product.

212.    Mr. Ferguson continues to want to purchase products that control weeds, including QuikPRO and other Products the Defendants manufacture, distribute or sell. He regularly visits online and brick and mortar stores where the Products are sold. Without purchasing and having the Products professionally tested or consulting scientific and regulatory experts, Mr. Ferguson will be unable to determine if representations that Defendants make regarding the properties and features of the Products are true and complete or the length of time in which he can safely use the Products. Because Mr. Ferguson does not know the formula for the Products, which can change over time, and cannot test whether the Products change in chemical composition over time and degrade into unlawful levels of NNG without first purchasing a Product, Mr. Ferguson will be unable to rely on the Products' labels when shopping for herbicide products in the future absent an injunction that requires Monsanto and Bayer CropScience to add a "Not for sale or use after

[date]" to the Products' labels via EPA's notification process. In addition, at present Mr. Ferguson cannot rely on the accuracy of Monsanto's and Bayer CropScience's labels for the entire line of glyphosate products, including glyphosate products that have more than 40% glyphosate, which Mr. Ferguson is also interested in purchasing with labeling that comports with regulations. Should Monsanto or Bayer CropScience begin to market and sell a new line of products, Mr. Ferguson could also be at risk for buying another one of their products in reliance on the same or similar misrepresentation and omissions. And because of unlawful and misleading labels on the Products, Mr. Ferguson cannot make informed choices between the herbicides offered by Monsanto and/or Bayer CropScience and herbicides offered by other manufacturers, such as choices based on price and length of time in which the product is suitable for consumer use.

## C. Ruby Cornejo

213.    Plaintiff Ruby Cornejo is a consumer who is interested in herbicide products. Ms. Cornejo has purchased Roundup products for decades. More recently, she has purchased QuikPRO packets from Amazon which were sent to her home in Galt, California in April 2022, December 2021, and April 2021. She also purchased QuikPRO packets from Tractor Supply in June 2020 and from Doitonmyown.com in April 2021.  She also purchased jugs of QuikPRO about four years ago from Horizon in Sacramento, California. She also has bought Roundup PROMAX jugs on multiple occasions from 2004 to 2020 from various stores, including Tractor Supply in Galt, California.  Ms. Cornejo uses the Products to maintain her rural property. She typically stores the Products in her barn where she also has a tractor. Her barn can get hot in the summer. When she has bought the Products in the larger quantities, like the QuikPRO and PROMAX jugs, it can take her longer than a year to go through a bottle.

214.    Ms. Cornejo made each of her purchases after reading and relying on the truthfulness of the QuikPRO and PROMAX labels, which among other things, promised that the Product contained "Roundup QuikPRO Herbicide" and/or "Roundup PROMAX Herbicide" as registered with EPA. Ms. Cornejo believed the truth of the representation, i.e., that the Product was chemically identical to the "Roundup QuikPRO Herbicide" and "Roundup PROMAX Herbicide" registered with EPA. The label also led her to believe that the Products contained

registered, EPA-approved herbicides. But, as explained above, the Products are not "Roundup QuikPRO Herbicide" and/or "Roundup PROMAX Herbicide" as registered with EPA because the registered "Roundup QuikPRO Herbicide" and "Roundup PROMAX Herbicide" can never exceed 1 ppm NNG at any point in time. The Products, by contrast, have a different chemical composition that enables them to develop NNG far in excess of the 1 ppm legal limit. EPA never approved or registered the Products' true chemical composition.  Had Ms. Cornejo known the truth, she would not have purchased the Products.

215.   Further, Ms. Cornejo made each of her purchases after reading and relying on the truthfulness of the Products' labels, which did not include "Not for sale or use after [date]." Because there was not a "Not for sale or use after [date]" disclaimer on the Products, she believed that the Products could be used for an indefinite duration when used and stored in accordance with the label. When Ms. Cornejo bought the Products, she did not see an expiration date or a "Not for sale or use after [date]" on the Products' labels. Had there been an expiration date, she would have noticed it. The length of time in which she could store and use the Products was important to her because some of the Products come in large quantities, and it can take her years to use the Products. Further, when she buys the Products that come in packets, she does not use all the packets at once and stores unused packets for long periods of time as well, often for years. Had Defendants complied with the law, and put a "Not for sale or use after [date]" disclaimer on the Product's label, she would not have been drawn to the Products and would not have purchased them. At a minimum, she would have paid less for each Product. Indeed, the Products are worth less to consumers since the Products do not last for an indefinite duration, but, rather, can be used only for a limited period of time, if at all.

216.   In addition, at the time of each of Ms. Cornejo's purchases of the Products, she was not aware that the Products were defective because they are substantially likely to develop uncontrollable and unlawful levels of a presumptive carcinogen, even with use and storage consistent with the label. This information was material to Ms. Cornejo because it concerns her safety in using the Products. Ms. Cornejo would not have purchased the Products or would not have paid as much for them if she had known of the defect with the Products.

217.    Ms. Cornejo continues to want to purchase products that control weeds, including QuikPRO and other products the Defendants manufacture, distribute or sell. She regularly visits online and brick and mortar stores where the Products are sold. Without purchasing and having the Products professionally tested or consulting scientific and regulatory experts, Ms. Cornejo will be unable to determine if representations that Defendants make regarding the properties and features of the Products are true and complete or the length of time in which she can safely use the Products. Because Ms. Cornejo does not know the formula for the Products, which can change over time, and cannot test whether the Products change in chemical composition over time and degrade into unlawful levels of NNG without first purchasing a Product, Ms. Cornejo will be unable to rely on the Products' labels when shopping for herbicide products in the future absent an injunction that requires Monsanto and Bayer CropScience to add a "Not for sale or use after [date]" to the Products' labels via EPA's notification process. In addition, at present Ms. Cornejo cannot rely on the accuracy of Monsanto's and Bayer CropScience's labels for the entire line of glyphosate products, including glyphosate products that have more than 40% glyphosate, which Ms. Cornejo is also interested in purchasing with labeling that comports with regulations. Should Monsanto or Bayer CropScience begin to market and sell a new line of products, Ms. Cornejo could also be at risk for buying another one of their products in reliance on the same or similar misrepresentation and omissions. And because of unlawful and misleading labels on the Products, Ms. Cornejo cannot make informed choices between the herbicides offered by Monsanto and/or Bayer CropScience and herbicides offered by other manufacturers, such as choices based on price and length of time in which the product is suitable for consumer use.

**D.  John Lysek**

218.    Plaintiff John Lysek is a consumer who is interested in herbicide products. Mr. Lysek purchased a new jug of QuikPRO from eBay, which was sent to his home in Redding, California, about two years ago. One of the reasons he purchased the Product was because he believed it would last for years since it was sold in a large quantity. It typically takes him years to go through a jug of QuikPRO. Mr. Lysek also bought packets of QuikPRO from eBay that were sent to his home in Redding, California about four years ago.

219.   Mr. Lysek made each of his purchases after reading and relying on the truthfulness of the QuikPRO label, which among other things, promised the Product contained "Roundup QuikPRO Herbicide" as registered with EPA. Mr. Lysek believed the truth of the representation, i.e., that the Product was chemically identical to the "Roundup QuikPRO Herbicide" registered with EPA. The label also led him to believe that the Product contained a registered, EPA-approved herbicide. But, as explained above, the Product is not "Roundup QuikPRO Herbicide" as registered with EPA because the registered "Roundup QuikPRO Herbicide" can never exceed 1 ppm NNG at any point in time. The Products, by contrast, have a different chemical composition that enables them to develop NNG far in excess of the 1 ppm legal limit. EPA never approved or registered the Products' true chemical composition. Had Mr. Lysek known the truth, he would not have purchased the QuikPRO.

220.   Further, Mr. Lysek made each of his purchases after reading and relying on the truthfulness of the QuikPRO label, which did not include "Not for sale or use after [date]." Because there was not a "Not for sale or use after [date]" disclaimer on the Products, he believed that QuikPRO could be used for an indefinite duration when used and stored in accordance with the label. When Mr. Lysek bought the QuikPRO, he did not see an expiration date or a "Not for sale or use after [date]" on the Products. Had there been an expiration date, he would have noticed it. The length of time in which he could store and use QuikPRO was important to him because it comes in a large quantity, and it can take him years to use the full jug. Further, when he buys QuikPRO in packets, he does not use all the packets at once and stores unused packets for long periods of time as well, often for years. Had Defendants complied with the law, and put a "Not for sale or use after [date]" disclaimer on the Product labels, he would not have been drawn to the Products and would not have purchased them. At a minimum, he would have paid less for each Product. Indeed, the Products are worth less to consumers since the Products do not last for an indefinite duration, but, rather, can be used only for a limited period of time, if at all.

221.   In addition, at the time of each of Mr. Lysek's purchases of the QuikPRO, he was not aware that it was defective because it was substantially likely to develop uncontrollable and unlawful levels of a presumptive carcinogen, even with use and storage consistent with the label.

This information was material to Mr. Lysek because it concerns his safety in using it. Mr. Lysek would not have purchased the QuikPRO or would not have paid as much for it if he had known of the defect with the Product.

222.    Mr. Lysek continues to want to purchase products that control weeds, including QuikPRO and other products the Defendants manufacture, distribute or sell. He regularly visits online and brick and mortar stores where the Products are sold. Without purchasing and having the Products professionally tested or consulting scientific and regulatory experts, Mr. Lysek will be unable to determine if representations that Defendants make regarding the properties and features of the Products are true and complete or the length of time in which he can safely use the Products. Because Mr. Lysek does not know the formula for the Products, which can change over time, and cannot test whether the Products change in chemical composition over time and degrade into unlawful levels of NNG without first purchasing a Product, Mr. Lysek will be unable to rely on the Products' labels when shopping for herbicide products in the future absent an injunction that requires Monsanto and Bayer CropScience to add a "Not for sale or use after [date]" to the Products' labels via EPA's notification process. In addition, at present Mr. Lysek cannot rely on the accuracy of Monsanto's and Bayer CropScience's labels for the entire line of glyphosate products, including glyphosate products that have more than 40% glyphosate, which Mr. Lysek is also interested in purchasing with labeling that comports with regulations. Should Monsanto or Bayer CropScience begin to market and sell a new line of products, Mr. Lysek could also be at risk for buying another one of their products in reliance on the same or similar misrepresentation and omissions. And because of unlawful and misleading labels on the Products, Mr. Lysek cannot make informed choices between the herbicides offered by Monsanto and/or Bayer CropScience and herbicides offered by other manufacturers, such as choices based on price and length of time in which the product is suitable for consumer use.

223.    The Products, in their current form, are worthless because Plaintiffs bargained for properly branded, EPA-approved herbicides that are chemically identical to the registered herbicides they purport to be and comport with limits EPA sets for toxicologically significant impurities like NNG. Instead, Plaintiffs received misbranded, unregistered herbicides that are not

EPA-approved, have not undergone a safety assessment by EPA, are chemically different from their registrations and are illegal to sell or distribute.

224.    On April 22, 2022, Mr. Koller and Mr. Ferguson notified Defendants Monsanto, Bayer CropScience, and Seamless Control by letter that the actions described above violated the CLRA, UCL, Magnusson-Moss Warranty Act, Song-Beverly Warranty Act, and the Products' express and implied warranties and that they intended to represent a class of similarly situated person. Plaintiffs demanded that they, among other things, recall the Products and to cease misleading consumers.

225.    Defendants Monsanto, Bayer CropScience, and Seamless Control refused to acknowledge any defects with the Products and dismissed it as "sheer speculation." Further, they staunchly refused to even inform consumers at large about the defect or otherwise address the failure to include a "Not for sale or use after [date]" disclaimer on the Products. In light of these failures, Plaintiffs Koller and Ferguson rejected Defendants' offer of refunds for the Products they purchased. Indeed, to date, Defendants have not initiated a recall of the Products.

## XIV.   CLASS ALLEGATIONS

226.    Plaintiffs bring this class action lawsuit on behalf of themselves and proposed classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> **The Class**:  All natural persons in the United States who purchased the Products other than for resale or distribution.

> **California Subclass**: All Class members who purchased the Products in California other than for resale or distribution.

227.    Excluded from the Class and California Subclass are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class and/or California Subclass; governmental entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class and/or California Subclass definitions based upon information learned through discovery.

228.    This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

229.    Numerosity: Plaintiffs do not know the exact size the Class and California Subclass, but they estimate that it is composed of more than 100 persons. The persons in the Class and California Subclass are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the court.

230.    Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products could be safely used for an indefinite duration of time and contained registered pesticides. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class and California Subclass to recover. The questions of law and fact common for the Class include:

- Whether there is a defect in the Products;
- The warranties that came with the Products;
- Whether Defendants breached the warranties for the Products; and
- Whether members are entitled to payment of actual, incidental, and/or consequential damages plus interest thereon, and if so, what is the nature of such relief.

231.    Further, the common questions of law and fact to the California Subclass include:

- Whether Defendants should have put a "Not for sale or use after [date]" on the Products;
- Whether the chemicals within the Products are registered pesticides;
- Whether Defendants' actions violate Federal and California laws invoked herein;
- Whether the marketing and/or labeling for the Products are unlawful and/or misleading;
- Whether Defendants misrepresented or omitted material facts in connection with the marketing, advertising, packaging, labeling and sale of the Products;
- Whether Defendants' failure to provide a "Not for sale or use after [date]" date on the

Products sold was likely to deceive reasonable consumers;

- Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the California Subclass;
- Whether Defendants engaged in the behavior knowingly, recklessly, or negligently;
- The amount of profits and revenues Defendants earned as a result of the conduct;
- Whether California Subclass members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and
- Whether California Subclass members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

232.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class and California Subclass because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation of law as complained of herein. Further, the damages of each member of the Class and California Subclass were caused directly by Defendants wrongful conduct in violation of the law as alleged herein

233.    Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all Class and California Subclass members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of Class and California Subclass members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Class and California Subclass. By prevailing on their own claims, Plaintiffs will establish Defendants' liability to all Class and California Subclass members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and California Subclass members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class and California Subclass members

234.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class and California Subclass members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

235.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiffs are, however, aware that, on June 21, 2022, Judge Chhabria, of the Northern District of California, entered an order preliminarily approving a class action settlement in *Gilmore v. Monsanto Company*, Case No. 21-8159 (N.D. Cal.) ("*Gilmore*").

236.    The *Gilmore* class is distinct from the Class alleged herein for a number of reasons. First, the *Gilmore* class does not cover all of the Products at issue in this litigation; rather, only two products overlap—i.e., Roundup Weed & Grass Killer Super Concentrate and Roundup PRO Concentrate are also part of the *Gilmore* settlement. Second, the *Gilmore* settlement does not cover the claims at issue in this case. Accordingly, even as to the two overlapping products, Plaintiffs' claims are not released in *Gilmore*. The *Gilmore* release specifically covers claims regarding "any alleged omission, regarding the alleged carcinogenicity, toxicity, genotoxicity, endocrine disruptive effects, or any other alleged health effects of the Products or any ingredient or component thereof, including, but not limited to, glyphosate." The *Gilmore* release language does not include claims regarding the sale or distribution of unregistered pesticides, the sale or distribution of products that have different chemical compositions from what is allowed under

their registrations, the sale or distribution of products that expire, or product defects that cause them to develop uncontrollable levels of NNG. Further, the *Gilmore* release does not discuss (or even mention) impurities like NNG; rather, it only relates to "any ingredient or components thereof." As set forth above, NNG is not an ingredient, or component of any ingredient, in the two overlapping products. Finally, the *Gilmore* class period is from August 19, 2017 to the date of preliminary approval—i.e., June 21, 2022. As discussed below, Defendants' fraudulent acts make tolling of the statute of limitations appropriate here, thus warranting a class period that both *ante* and *post*-dates the *Gilmore* class. Finally, the *Gilmore* class counsel did not investigate or litigate about NNG or other impurities nor make the factual and legal allegations asserted by Plaintiffs here.

237.    In any event, each of the named Plaintiffs intend to, and hereby does, opt-out of the *Gilmore* settlement.

## ANY APPLICABLE STATUTE OF LIMITATIONS ARE TOLLED

### I.   THE DISCOVERY RULE

238.    The tolling doctrine is designed for cases of concealment such as this. Plaintiffs, the Class and California Subclass members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were concealing and misrepresenting the Products' true chemical composition to regulators and the public.

239.    Plaintiffs and Class and California Subclass members had no realistic ability to discover the fact that the ordinary use of the Products causes the Products to change in chemical composition over time and form a presumably carcinogenic chemical at impermissible levels because Defendants hid those facts from EPA and the public.

240.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

### II.   FRAUDULENT CONCEALMENT

241.    All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

242. Defendants have known of the Products' reactivity with nitrites and their propensity to form NNG at unlawful levels through consumers' ordinary use since at least 1997, when Monsanto had evidence of NNG forming above the 1 ppm limit in its glyphosate-based products. And it was certainly aware by 2004 when Monsanto conducted a study on the topic and had evidence of NNG levels at 80 times over the regulatory limit in glyphosate products. Since then, Defendants have intentionally concealed from, or failed to notify, regulators, Plaintiffs, Class and California Subclass members, and the consumers who buy Defendants' glyphosate products of the true nature of the Products and the fact that the Products should not be used after a certain date.

243. Despite knowing about the instability of glyphosate and the dangers posed by formulating the Products with concentrations of glyphosate of over 40%, Defendants did not acknowledge the problem, and in fact actively concealed it. Even to present day, Defendants have denied any wrongdoing and continue to conceal material facts, evidence and information from regulators in violation of their duty to report such information.

244. Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FIFRA and regulations promulgated thereunder by the EPA. Plaintiffs rely on the FIFRA and EPA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*
*On Behalf of Plaintiffs and the Class Against Defendants Monsanto, Seamless Control, and Bayer CropScience*

245. Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

246. This cause of action is brought pursuant to the Magnuson-Moss Warranty Act, 15

U.S.C. § 2301, *et seq.* ("MMWA").

247.    This claim is brought against Defendants Monsanto, Seamless Control, and Bayer CropScience (collectively, the "Warranty Defendants") on behalf of the members of the Class.

248.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

249.    Plaintiffs and members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301(3).

250.    Each Warranty Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5), respectively.

251.    The Products are "consumer products" within the meaning of 15 U.S.C. § 2301(1). The Products are consumer goods, used for household purposes, including controlling weeds in home gardens, lawns, and other household areas (e.g., driveways and patios with cracks into which weeds can grow). For example, QuikPRO lists sites for use that include apartment complexes, driveways, fencerows, landscape areas, ornamental landscapes, parking areas, recreational areas, and residential areas.  The instructions specifically state the product should not be used on plants grown for commercial sale or use. Further, the Products are available for purchase by ordinary consumers via both online retailers, including Amazon, DoMyOwn.com, and Forestrydistributing.com, that sell to California consumers and brick-and-mortar stores in California that sell herbicides, including Lowes, Home Depot, Tractor Supply, Costco and Ace Hardware.

252.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

253.    The amount in controversy of Plaintiffs' individual claims meet or exceed $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit since each Plaintiff has over $50,000 in attorneys' fees.

254.    Each Warranty Defendant provided Plaintiffs and each member of the Class with "written warranties" and "implied warranties," which are covered under 15 U.S.C. § 2301(6) and

1  (7) respectively.

2      255.    Almost all of the Products come with the express warranty that the Products

3  "conform[] to the chemical description on the label." The Warranty Defendants breached this

4  warranty because the Products' chemical composition changes significantly as consumers use the

5  Products in accordance with the label. Further, each Products' true chemical composition is not

6  and has never been registered with EPA and is different in chemical composition from what is

7  allowed under their Confidential Statement of Formula at sale or distribution since the Products

8  can and are substantially likely to develop levels of NNG above the certified limits and, therefore,

9  may not be lawfully sold or distributed.

10      256.    Many of the Products come with the express warranty that the Product "is

11  reasonably fit for the purposes set forth in the Complete Directions for Use label booklet

12  ("Directions") when used in accordance with those Direction under the conditions described

13  therein." Each of the Warranty Defendants breached this warranty because the Products were can

14  and are substantially likely to develop unlawful levels of NNG, even when used and stored in

15  accordance with the label. This defect, which was known only by Defendants and not reasonably

16  discoverable prior to purchase by Plaintiffs or class members, made them unreasonably unsafe

17  because it exposes consumers to a presumptive carcinogen. Further, the Products were not

18  reasonably fit because they are unregistered pesticides not approved by EPA and/or have chemical

19  compositions that differ from what is allowed in their respective Confidential Statements of

20  Formula at sale or distribution, which makes them illegal to sell or distribute.

21      257.    Each Product sold by Warranty Defendants comes with an implied warranty that

22  it will merchantable and fit for the ordinary purpose for which it would be used that are "implied

23  warranties" within the meaning of 15 U.S.C. § 2301(7).  Each Warranty Defendant has breached

24  its implied warranty of merchantability because the Products were not in merchantable condition

25  when sold, were defective when sold, and/or do not possess even the most basic degree of fitness

26  for ordinary use, as described above.

27      258.    The terms of these warranties became part of the basis of the bargain when

28  Plaintiffs and each member of the Class purchased a Product.

259.    Plaintiffs and each member of the Class have had sufficient direct dealings with the Warranty Defendants via their agents (including distributors, dealers, and sellers authorized by the Warranty Defendants) to establish privity of contract between the Warranty Defendants, on the one hand, and Plaintiffs and each member of the Class, on the other hand.

260.    Nonetheless, privity is not required here since Plaintiffs and each member of the Class were third-party beneficiaries of the Warranty Defendants' agreements with distributors and sellers for the distribution, dealing, and sale of the Warranty Defendants' Products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of the Warranty Defendants' implied warranties. The Products are manufactured with the express purpose an intent of being sold to consumers, and the distributors and sellers were not the intended ultimate consumers of the Products.

261.    Plaintiffs Koller and Ferguson have met all requirements for pre-suit notice. However, pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give the Warranty Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

262.    Furthermore, affording the Warranty Defendants a reasonable opportunity to cure their breach of the warranties would be unnecessary and futile. At the time of sale of each Product, the Warranty Defendants knew, or should have known that the Products were not merchantable, but nonetheless failed to rectify the situation and/or disclose the defects. In addition, despite receiving notice of the breach, the Warranty Defendants have not made any effort to resolve the defect with the Products, and, in fact, deny that there is any defect at all.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the class resort to an informal dispute resolution procedure and/or afford the Warranty Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

263.    In addition, given the conduct described herein, any attempts by the Warranty Defendants, in their capacity as warrantors, to limit the implied warranties in a manner that would

exclude coverage of the defects in Product is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void, especially since the Products themselves were illegal to sell or distribute. Further, California provides that "[n]o limitations of warranty by the seller shall exclude or waive either of the following warranties: (a) [t]hat the pesticide corresponds to all claims and descriptions that the registrant has made in respect to it in print; (b) [t]hat the pesticide is reasonably fit for use for any purpose for which it is intended according to any printed statement of the registrant." Cal. Food & Ag. Code § 12854. Thus, both of the warranties provided under Cal. Food & Ag. Code § 12854 were made for the Products. Defendants' breaches of the express and implied warranties, as described above, breached both of the warranties provided under Cal. Food & Ag. Code § 12854 for all the Products.

264.    As a direct and proximate result of the Warranty Defendants' breach of the written and implied warranties, Plaintiffs and each member of the class have suffered damages, in that the Products they purchased were so inherently flawed, unfit, or unmerchantable as to have significantly diminished or no intrinsic market value. Plaintiffs, individually and on behalf of the class, seek all damages permitted by law, including compensation for the cost of purchasing Products, along with all other incidental and consequential damages, statutory attorney fees, equitable relief, and all other relief allowed by law.

## PLAINTIFFS' SECOND CAUSE OF ACTION
### Violation of the Song-Beverly Consumer Warranty Act For Breach of Express Warranties, Cal. Civ. Code §§ 1791.2 & 1793.2(d)
*On Behalf of Plaintiffs and the California Subclass Against Defendants Monsanto, Seamless Control and Bayer CropScience*

265.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

266.    Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

267.    The Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

268.    Defendants Monsanto and Bayer CropScience are "manufacturers" within the

meaning within the meaning of Cal. Civ. Code § 1791(j).

269.   Defendant Seamless Control is a "distributor" within the meaning of Cal. Civ. Code § 1791(e).

270.   Plaintiffs and the California Subclass members bought new Products manufactured by Monsanto and Bayer CropScience and/or distributed by Seamless Control.

271.   The Warranty Defendants made express warranties to Plaintiffs and the California Subclass within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

272.   Almost all of the Products come with the express warranty that the Products "conform[] to the chemical description on the label." The Warranty Defendants breached this warranty because the Products' chemical composition changes significantly as consumers use the Products in accordance with the label. Further, each Product's true chemical composition is not and has never been registered with EPA and is different from what is allowed in its Confidential Statement of Formula at sale or distribution since the Products can and are substantially likely to develop levels of NNG above the certified limits and, therefore, may not be lawfully sold or distributed.

273.   Many of the Products come with the express warranty that the Product "is reasonably fit for the purposes set forth in the Complete Directions for Use label booklet ("Directions") when used in accordance with those Direction under the conditions described therein." Each of the Warranty Defendants breached this warranty because the Products had unlawful levels of NNG were substantially likely to develop unlawful levels of NNG. This defect, which was known only by Defendants and not reasonably discoverable prior to purchase by Plaintiffs or class members, made them unreasonably unsafe because it exposes consumers to a presumptive carcinogen. Further, the Products were not reasonably fit because they were unregistered pesticides not approved by EPA and/or have chemical compositions that are different from what is allowed in their respective Confidential Statements of Formula at sale or distribution, which makes illegal to sell or distribute.

274.   The Warranty Defendants provided these warranties to Plaintiffs and the California Subclass.  These warranties formed the basis of the bargain that was reached when

Plaintiffs and the California Subclass purchased of the Products.

275.     However, the Warranty Defendants knew or should have known that the warranties were false and/or misleading. The Warranty Defendants were aware that the Products were substantially likely to develop NNG above legal limits, which posed a safety hazard to consumers since NNG is a presumptive carcinogen. The Warranty Defendants, therefore, knew the Products contained a defect, and notice of the breach is not required.

276.     Plaintiffs and the California Subclass reasonably relied on the Warranty Defendants' express warranties concerning the chemical composition of the Products and/or the Products' fitness for the purposes set forth in the Directions for Use when making their purchases. However, the Products were not as warranted. Unbeknownst to Plaintiffs and the California Subclass, the Products were designed such that they form a presumably carcinogenic chemical at levels higher than legal limits, even with normal use and storage consistent with the label. This was a defect. The Warranty Defendants, therefore breached their express warranties by providing products containing defects that were never disclosed to Plaintiffs and the California Subclass, even though the defects were only known to Defendants and not reasonably discoverable prior to purchase by Plaintiffs or class members.

277.     Further, the Warranty Defendants breached their express warranties because each Product's true chemical composition is not and has never been registered with EPA and is different from what is allowed in its respective Confidential Statement of Formula at sale or distribution since the Products can and are substantially likely to develop levels of NNG above the certified limits and, therefore, may not be lawfully sold or distributed.

278.     Any opportunity to cure the express breach is unnecessary and futile.

279.     As a direct and proximate result of the Warranty Defendants' breach of express warranties, Plaintiffs and the California State Class suffered significant damages, in that the Products they purchased were so inherently flawed, unfit, or unmerchantable as to have significantly diminished or no intrinsic market value, and seek damages in an amount to be determined at trial.

280.     Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiffs and the California Subclass members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

### PLAINTIFFS' THIRD CAUSE OF ACTION
**Violation of the Song-Beverly Consumer Warranty Act For Breach of Implied Warranty of Merchantability, Cal. Civ. Code §§ 1791.1 and 1792**
*On Behalf of Plaintiffs and the California Subclass Against Defendants Monsanto and Bayer CropScience*

281.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

282.     Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

283.     The Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

284.     Defendants Monsanto and Bayer CropScience are "manufacturers" within the meaning within the meaning Cal. Civ. Code § 1791(j).

285.     Monsanto and Bayer CropScience impliedly warranted to Plaintiffs and the Class that the Products were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Products do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

286.     Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.
(2) Are fit for the ordinary purposes for which such goods are used.
(3) Are adequately contained, packaged, and labeled.
(4) Conform to the promises or affirmations of fact made on the container or label.

287.     The Products would not pass without objection in the trade due to the defect in the Products, as described above, and because they are illegal to sell or distribute since they are

1  unregistered pesticides and/or have different chemical compositions from what is allowed in

2  their respective Confidential Statements of Formula at the time of their sale or distribution.

3      288.   Because of the defect in the Products as well as their status as illegal pesticides

4  that cannot be sold or distributed, the Products are not in merchantable condition and thus not fit

5  for ordinary purposes. Unbeknownst to Plaintiffs and the California Subclass, the Products were

6  designed such that they form a presumably carcinogenic chemical at levels higher than legal

7  limits, even with normal use and storage consistent with the label. This was a defect that made

8  the Products unreasonably unsafe. This defect was only known to Defendants and not reasonably

9  discoverable prior to purchase by Plaintiffs or class members. Also unbeknownst to Plaintiffs,

10  the Products' true chemical composition was not registered with EPA and/or differed from what

11  was allowed in their Confidential Statements of Formula at the time of their sale or distribution,

12  and, therefore, were illegal to sell or distribute.

13      289.   The Products are not adequately labeled because the labels fail to include a "Not

14  for sale or use after [date]" disclosure pursuant to 40 C.F.R. § 156.10(g)(6). The labels also make

15  it appear as if the Products are registered pesticides when they are not. The labels further make it

16  appear as if they are chemically equivalent to registered pesticides when they are not. Rather, the

17  Products are imitations of registered pesticides.

18      290.   Monsanto and Bayer CropScience breached the implied warranty of

19  merchantability and caused damage to Plaintiffs and the California class members who

20  purchased the Products since they did not receive the benefit of their bargain.

21      291.   Notice of breach is not required because the Plaintiffs and the California Subclass

22  did not purchase the Products directly from Monsanto and/or Bayer CropScience. Further,

23  Monsanto and Bayer CropScience had notice of these issues by its knowledge of the issues as

24  described above.

25      292.   Any effort by Monsanto and Bayer CropScience to disclaim the implied warranty

26  of merchantability was null and void because the Products were purchased off-the-shelf from

27  brick and mortar or online retailers not sold on an "as is" or "with all faults" basis per Cal. Civ.

28  Code § 1792.3. Further, because Monsanto and Bayer CropScience made express warranties as

described above, they could not disclaim the implied warranty of merchantability under Cal. Civ. Code § 1793. Finally, any effort to disclaim implied warranties is null and void because the Products were illegal to sell or distribute, as explained above.

293.    As a direct and proximate result of Monsanto's and Bayer CropScience's breach of implied warranty of merchantability, Plaintiffs and the California Subclass received goods whose dangerous condition substantially impairs their value.

294.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the California Subclass seek an order enjoining Monsanto's and Bayer CropScience's unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

## PLAINTIFFS' FOURTH CAUSE OF ACTION
### Breach of Implied Warranty, Cal. Com. Code § 2314
*On Behalf of Plaintiffs and the California Subclass Against Monsanto, Seamless Control and Bayer CropScience*

295.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

296.    The Warranty Defendants were at all relevant times "merchants" with respect to the Products under Cal. Com. Code § 2104(1) and "sellers" of the Products under § 2103(1)(d).

297.    The Products are and were at all relevant times "goods" within the meaning of Cal. Com. Code § 2105(1).

298.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which the Products are used is implied by law pursuant to Cal. Com. Code § 2314 and Cal. Food & Ag. Code § 12854.

299.    The Warranty Defendants sold Products that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty and Cal. Food & Ag. Code 12854. Unbeknownst to Plaintiffs and the California Subclass, the Products were designed such that they form a presumably carcinogenic chemical at levels higher than legal limits, even with normal use and storage consistent with the label. This was a defect that made the Products unreasonably unsafe. This defect was only known to Defendants and not reasonably

discoverable prior to purchase by Plaintiffs or class members. The Products were not in merchantable condition due to the defect, as explained above, and because they are unregistered pesticides and/or have different chemical compositions from what is allowed in their respective Confidential Statements of Formula, which made them illegal to sell or distribute. The Products were not fit for their ordinary purpose as they are substantially likely to develop unlawful levels of a presumably carcinogenic impurity that creates a safety hazard for consumers. The Products were also not fit for their ordinary purpose because they are unregistered pesticides and/or have different chemical compositions from what was allowed in their respective Confidential Statements of Formula, which made them illegal to sell or distribute.

300.    Any attempt to disclaim the implied warranties provided in Cal. Food & Ag. Code § 12854 is unlawful and improper since it provides that "[n]o limitations of warranty by the seller shall exclude or waive either of the following warranties: (a) [t]hat the pesticide corresponds to all claims and descriptions that the registrant has made in respect to it in print; (b) [t]hat the pesticide is reasonably fit for use for any purpose for which it is intended according to any printed statement of the registrant." Cal. Food & Ag. Code § 12854. Thus, both of the warranties provided under Cal. Food & Ag. Code § 12854 were made for the Products. Defendants' breaches of the implied warranties, as described above, breached both of the warranties provided under Cal. Food & Ag. Code § 12854 for all the Products.

301.    The Warranty Defendants' breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the California Subclass. The amount of damages due will be proven at trial.

## PLAINTIFFS' FIFTH CAUSE OF ACTION
### Breach of Express Warranty, Cal. Com. Code § 2313
*On Behalf of Plaintiffs and the California Subclass Against Monsanto, Seamless Control and Bayer CropScience*

302.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

303.    The Warranty Defendants were at all relevant times "merchants" with respect to the Products under Cal. Com. Code § 2104(1) and "sellers" of the Products under § 2103(1)(d).

304.     The Products are and were at all relevant times "goods" within the meaning of Cal. Com. Code § 2105(1).

305.     The Warranty Defendants made express warranties on the labels of the Products, as explained above.

306.     Almost all of the Products come with the express warranty that the Products "conform[] to the chemical description on the label." The Warranty Defendants breached this warranty because the Products' chemical composition changes significantly as consumers use the Products in accordance with the label. Further, each Product's true chemical composition is not and has never been registered with EPA and/or differs from what is allowed in its respective Confidential Statement of Formula because the Products can and are substantially likely to develop levels of NNG above the certified limits and, therefore, may not be lawfully sold or distributed.

307.     Many of the Products come with the express warranty that the Product "is reasonably fit for the purposes set forth in the Complete Directions for Use label booklet ("Directions") when used in accordance with those Direction under the conditions described therein." Each of the Warranty Defendants breached this warranty because the Products were substantially likely to develop unlawful levels of NNG even when used and stored in accordance with the label. This defect, which was known only by Defendants and not reasonably discoverable prior to purchase by Plaintiffs or class members, made them unreasonably unsafe because it exposes consumers to a presumptive carcinogen. Further, the Products were not reasonably fit because they were unregistered pesticides and/or have different chemical compositions from what was allowed in their respective Confidential Statements of Formula, which made them illegal to sell or distribute.

308.     The Warranty Defendants provided these warranties to Plaintiffs and the California Subclass. These warranties formed the basis of the bargain that was reached when Plaintiffs and the California Subclass purchased the Products.

309.     However, the Warranty Defendants knew or should have known that the warranties were false and/or misleading. The Warranty Defendants were aware that the Products

were substantially likely to develop NNG above legal limits, even when used and stored in accordance with the label, which posed a safety hazard to consumers since NNG is a presumptive carcinogen. The Warranty Defendants, therefore, knew the Products contained a defect.

310.    Plaintiffs and the California Subclass reasonably relied on the Warranty Defendants' express warranties concerning the chemical composition of the Products and the Products' fitness for the purposes set forth in the Directions for Use when making their purchases. However, the Products were not as warranted. Unbeknownst to Plaintiffs and the California Subclass, the Products were designed such that they form a presumably carcinogenic chemical at levels higher than legal limits and significantly changed in composition over time. These were defects. The Warranty Defendants, therefore breached their express warranties by providing products containing defects that were never disclosed to Plaintiffs and the California Subclass.

311.    Any opportunity to cure the express breach is unnecessary and futile.

312.    As a direct and proximate result of the Warranty Defendants' breach of express warranties, Plaintiffs and the California Subclass suffered significant damages, and seek damages in an amount to be determined at trial.

### PLAINTIFFS' SIXTH CAUSE OF ACTION
### Fraudulent Concealment
*On Behalf of Plaintiffs and the California Subclass Against Defendants*

313.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

314.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the California Subclass against each of the Defendants.

315.    Each Defendant committed fraud by intentionally concealing, suppressing, and failing to disclose material facts regarding the Products, including that (i) the Products were defective; (ii) the Products are unregistered pesticides; (iii) the Products do not contain EPA-approved herbicides; (iv) the Products are not the registered herbicides they purport to be; (iv) the Products expire; and (v) the Products should not be used after a certain period of time.

316.    Defendants knew or should have known the true facts, due to their involvement in

the design, testing, manufacture, sale, distribution and registration of the Products and obligations under FIFRA. Yet, at no time did any of these Defendants reveal the truth Plaintiffs or the California Subclass. Defendants, instead, concealed the truth, intending for Plaintiffs and the California Subclass to rely – which they did. In fact, Monsanto took steps to ensure that their employees did not reveal the known defect to regulators or consumers.

317.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing an herbicide and pose a serious safety hazard to consumers. They also were material because they directly impact the value of the Products purchased and the legality of Defendants' sale and distribution of the Products. Plaintiffs and California Subclass Members trusted Defendants not to sell them Products that were defective or that were illegal to sell.

318.    A reasonable consumer would not have expected the Products to be unfit for use because they develop unlawful levels of a presumptive carcinogen under real world conditions. A reasonable consumer also would not have expected the Products to be unregistered pesticides, not approved by EPA that could not be lawfully sold. Reasonable consumers also would not expect the Products to expire and be unfit for use after a certain period of time in the absence of a "Not for sale or use after [date]." Rather, reasonable consumers would expect the Products to be chemically equivalent to the registered pesticides the Products purport to be. Plaintiffs and the members of the Class did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, find out the truth on their own.

319.    Defendants had a duty to disclose that the Products expired; should not be used after a certain period of time; were unregistered pesticides; do not contain EPA-approved herbicides; the Products were not the registered pesticides they claimed to be; and are defective. Defendants had such a duty because the true facts were known and/or accessible only to them and because these facts were not known to or reasonably discoverable by Plaintiffs or the members of the California Subclass. Defendants were also legally required to disclose the facts under federal law.

320.     Had the truth been revealed, Plaintiffs and the California Subclass would not have purchased the Products, or would have paid less for them. Plaintiffs and the members of the California Subclass sustained damage because they own the Products that never should have been placed in the stream of commerce. Accordingly, Defendants are liable to Plaintiffs and the members of the California Subclass for damages in an amount to be proven at trial.

321.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the California Subclass; and to enrich themselves. Their misconduct warrants assessment of punitive damages in an amount sufficient to deter such conduct in the future, which shall be determined at trial.

### PLAINTIFF'S SEVENTH CAUSE OF ACTION
**Common Law Fraud, Deceit and/or Misrepresentation**
*On Behalf of Plaintiffs and the California Subclass Against Defendants*

322.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

323.     Plaintiffs bring this claim individually and on behalf of the other members of the California Subclass.

324.     Defendants have fraudulently and deceptively represented the Products to be registered pesticides. Defendants do so by selling and distributing the Products under the names of registered pesticides even though, in truth, the Products are not registered pesticides and differ in chemical composition from the registered pesticides they purport to be. They are, accordingly, illegal to sell or distribute.

325.     These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiffs, and material at the time they were made. Defendants knew or should have known the composition of the Products, and knew or should have known that the Products are unregistered pesticides; are chemically different from what is allowed in their Confidential Statements of Formula; and illegal to sell or distribute. Defendant's misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Products. In misleading Plaintiffs and not

so informing Plaintiffs, Defendants breached their duty to them. Defendants also gained financially from, and as a result of, their breach.

326.     Plaintiffs and those similarly situated relied to their detriment on Defendants' misrepresentations. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

327.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

328.     Plaintiffs and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations, and, accordingly, were damaged by Defendants.

329.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

330.     Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiffs and those similarly situated.

## PLAINTIFFS' EIGHTH CAUSE OF ACTION
### Violations of the Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq*
*On Behalf of Plaintiffs and the California Subclass Against Monsanto, Bayer CropScience, and Seamless Control*

331.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

332.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq*. ("CLRA") by Plaintiffs and is brought against Defendants Monsanto, Bayer CropScience, and Seamless Control, which are referred to as "Defendants" for purposes of this cause of action.

333.    Defendants, Plaintiffs, and the California Subclass members are "persons" within the meaning of Cal. Civ. Code § 1761(c). Plaintiffs and the California Subclass members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

334.    The Products that Plaintiffs and members of the California Subclass purchased are "goods" within the meaning of California Civil Code § 1761.

335.    Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

336.    The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

337.    In the course of their business, Defendants, through their agents, employees, and subsidiaries, violated the CLRA as detailed above. They did so by, among other things as described above, manufacturing, selling and/or distributing Products that can and are substantially likely to develop unlawful levels of a presumably carcinogenic chemical which they concealed from regulators and consumers; manufacturing, selling and/or distributing the Products as registered pesticides even though they were not; selling and distributing pesticides that differ in chemical composition from what is allowed in their Confidential Statements of Formula at the time of their sale or distribution; selling and/or distributing the Products as containing EPA-approved herbicides even though they do not; selling and/or distributing Products that misled consumers into believing they are chemically identical to registered pesticides when they are not; selling and/or distributing the Products as registered pesticides even though they were not; selling and distributing pesticides that differ in chemical composition from what is allowed in their Confidential Statements of Formula at the time of their sale or distribution; selling and/or distributing the Products as containing EPA-approved herbicides even though they do not; selling and/or distributing Products under the name of registered pesticides even though they are chemically different from the registered pesticides they purport to be; selling and/or distributing Products without including a "Not for sale or use after [date]," and marketing, offering for sale

- 78 -
CLASS ACTION COMPLAINT

and selling defective Products that pose a safety hazard to consumers. In committing these acts, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Cal. Civ. Code § 1770(a):

    a. Misrepresenting the source, sponsorship, approval, or certification of goods or services;

    b. Representing that the Products have approval, characteristics, ingredients, uses, or benefits that they do not have;

    c. Representing that the Products are of a particular standard, quality and grade when they are not; and/or

    d. Advertising the Products with the intent not to sell or lease them as advertised.

338. As explained above, Defendants had knowledge of the defect with the Products.

339. Defendants' concealment of the true characteristics of the Products was material to Plaintiffs and the California Subclass. Had they known the truth, Plaintiffs and the California Subclass would not have purchased the Products, or—if the Products' true nature had been disclosed, and the Products rendered legal to sell—would have paid significantly less for them.

340. Plaintiffs and California Subclass members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because the Products are complex chemical formulations whose composition is unknown to consumers. Further, testing is not readily available. Plaintiffs and California Subclass members did not, and could not, unravel Defendants' deception on their own.

341. Defendants, as explained above, had an ongoing duty to Plaintiffs and the California Subclass to refrain from unfair and deceptive practices under the CLRA in the course of their business. Specifically, Defendants owed Plaintiffs and California Subclass members a duty to disclose material facts concerning the Products because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the California Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

342.     Plaintiffs and California Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

343.     Defendants' violations present a continuing risk to Plaintiffs and the California Subclass, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

344.     Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against Defendants of up to $5,000 for each California Subclass member who qualifies as a "senior citizen" or "disabled person" under the CLRA, which includes Plaintiff Cornejo. Defendants knew or should have known that their conduct was directed to one or more California Subclass members who are senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen. One or more California Subclass members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health, infirmity and/or sensitivity to toxic substances, and each of them suffered economic damage resulting from Defendants' conduct.

345.     More than thirty days prior to the filing of this Complaint, Plaintiffs Koller and Ferguson provided Defendants with notice and demand that Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendants failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated California Subclass members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices

346.     Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## PLAINTIFFS' NINTH CAUSE OF ACTION
### (False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))
*On Behalf of Plaintiffs and the California Subclass Against Monsanto, Seamless Control and Bayer CropScience*

347.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

348.     Plaintiffs bring this claim against Monsanto, Seamless Control and Bayer CropScience, which are collectively referred to herein for purposes for cause of action as "Defendants."

349.     California Bus. & Prof. Code § 17500 states: "It is unlawful for any person, ... corporation ...or any employee thereof with intent directly or indirectly to dispose of real or personal property... or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... before the public in this state or from this state before the public in any state, in any newspaper or other publication, or any advertising device, ... or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

350.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of this Complaint, Defendants made or caused to be made and disseminated throughout California and the United States untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

351.     Defendant made representations and statements (by omission) on the Products' labels that led reasonable customers to believe that the Products that they were purchasing (i) were registered pesticides; (ii) contained EPA-approved herbicides; (iii) were chemically identical to registered pesticides; (iv) did not expire; and/or (v) were safe to use for the entire life cycle of the Product if used and stored in accordance with the label instructions. Further, Defendants had a duty to discloses these facts, which Defendants failed to do.

352.     Plaintiffs and the California Subclass members relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each

of the omissions and misrepresentations set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' Products or paying less for them.

353.    Defendants' acts and omissions are likely to deceive the general public.

354.    Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

355.    The aforementioned practices, which Defendants used, and continues to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

356.    As a direct and proximate result of such actions, Plaintiffs and the other California Subclass members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

357.    Plaintiffs seek, on behalf of themselves and the California Subclass, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiffs, the California Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to

establish each California Subclass member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiffs, the California Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs re unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendants acted in good faith.

358.    Plaintiffs seek, on behalf of themselves and the California Subclass, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

359.    Plaintiffs seek, on behalf of themselves and the California Subclass, an injunction requiring Monsanto and Bayer CropScience to add a "Not for sale or use after [date]" to the Products via EPA's notification process. Absent an injunction, Monsanto and Bayer CropScience will continue to cause injury in fact to the general public and the loss of money and property in that Monsanto and Bayer CropScience will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Monsanto and Bayer CropScience to which it is not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PLAINTIFFS' TENTH CAUSE OF ACTION
### (Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq*)
*On Behalf of Plaintiffs and the California Subclass Against all Defendants*

360.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

361.     Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this Complaint.

362.     Defendants have engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the California Food & Agriculture Code, including without limitation Cal. Food & Agric. Code § 12811; § 12881 generally, including (a), (c), (d); § 12882(b); § 12991 generally, including (a), (b), (c); § 12992; § 12993; § 12996, and (iii) and federal laws regulating the advertising and branding of pesticides in 21 U.S.C. § 343(a), *et seq.*, including but not limited to 7 U.S.C. § 136(q)(1)(A), (C), (E), (F), (G); § 136a(a); § 136j(a)(1)(A), (C), and (E); § 136j(a)(2)(S), and EPA regulations, including but not limited to 40 C.F.R. § 156.10(a)(5), § 156.10(g)(6), §158.350.

363.     In particular, Defendants have engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) unlawfully selling and distributing unregistered pesticides; (ii) unlawfully selling and distributing pesticides that differ in chemical composition from what is allowed under their Confidential Statements of Formula at the time of their sale or distribution; (iii) unlawfully selling and distributing the Products under the names of registered pesticides even though the Products are chemically different from the registered pesticides they purport to be; (iv) unlawfully selling and distributing Products that expire without informing consumers; and (v) marketing, offering for sale and selling Products that Defendants knew were defective and pose a safety hazard to consumers.

364.     As explained above, Defendants had knowledge of the defect with the Products.

365.     Further, each Defendant committed fraud by selling and distributing pesticides that were illegal to sell and distribute, as described above. Further, Monsanto, Bayer CropScience, Scotts and Seamless Control committed fraud by failing to disclose the defect with the Products which was material to consumers because the defect causes the Products to develop

unlawful levels of a probable carcinogen. Each of the Defendants further committed fraud by intentionally concealing, suppressing, and failing to disclose material facts regarding the Products, including that the Products were unregistered pesticides; do not contain EPA-approved herbicides; are not chemically identical to registered herbicides; expire; and should not be used after a certain period of time. Defendants knew or should have known the true facts, due to their involvement in the design, testing, manufacture, sale, distribution, and registration of the Products and due to their obligations under FIFRA and California law. Yet, at no time did any of these Defendants reveal the truth Plaintiffs or the California Subclass. Defendants, instead, concealed the truth, intending for Plaintiffs and the California Subclass to rely – which they did. In fact, Monsanto took steps to ensure that their employees did not reveal known the defect to regulators or consumers.

366.    Plaintiffs and those similarly situated relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, or (ii) paying less for the Products.

367.    Defendants' acts and omissions are likely to deceive the general public.

368.    Defendants engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

369.    The aforementioned practices, which Defendants have used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

370.    As a direct and proximate result of such actions, Plaintiffs and the other California Subclass members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.  Among other things, Plaintiffs, California Subclass

members lost the amount they paid for the Products.

371.    As a direct and proximate result of such actions, Defendants have enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

372.    Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendants as a result of Defendants' conduct. Plaintiffs and the California Subclass lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the California Food & Agriculture Code does not provide a direct cause of action, so Plaintiffs and the California Subclass members must allege those violations as predicate acts under the UCL to obtain relief.

373.    Plaintiffs also seek equitable relief, including restitution, with respect to their UCL "fraudulent" prong claims.  Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the California Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each California Subclass member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class).

374.    Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

375.     Plaintiffs seek, on behalf of those similarly situated, an injunction requiring Bayer CropScience and Monsanto to add a ""Not for sale or use after [date]" to the Products via EPA's notification process. Absent an injunction, Bayer CropScience and Monsanto will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PLAINTIFF'S ELEVENTH CAUSE OF ACTION
### (Unjust Enrichment)
*On Behalf of Plaintiffs and the California Subclass Against all Defendants*

376.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

377.     Plaintiffs brings this claim individually and on behalf of the other members of the California Subclass.

378.     Plaintiffs and members of the California Subclass conferred a benefit on the Defendants by purchasing the Products.

379.     Defendants have been unjustly enriched in retaining the revenues from Plaintiffs and members of the California Subclass's purchases of the Products, which retention is unjust and inequitable, because the Products were illegal to sell and Defendants falsely represented that the Products contained registered, EPA-approved herbicides even though they did not. Defendants also hid the defect from Plaintiffs and members of the California Subclass. These actions harmed Plaintiffs and members of the California Subclass because they paid a price premium as a result.

380.     Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and members of the California Subclass is unjust and inequitable, Defendants must pay restitution to Plaintiffs and members of the California Subclass for its unjust enrichment, as

ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

381.     Plaintiffs, therefore, seek an order requiring Defendants to make restitution to them and other members of the California Subclass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendants as follows:

A.     Certification of the proposed Classes, including appointment of Plaintiff's counsel as class counsel;

B.     An order temporarily and permanently enjoining Defendants Monsanto and Bayer CropScience from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.     An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.     An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.     An award of treble damages, except for those causes of action where treble damages are not legally available;

G.     An award of restitution in an amount to be determined at trial;

H.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.     For reasonable attorneys' fees and the costs of suit incurred; and

J.     For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 22, 2022

**GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*
Seth A. Safier, Esq.
Marie McCrary, Esq.
Anthony Patek, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Kali Backer, Esq.
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303

**WOOL TRIAL LAW LLC**

*/s/David J. Wool/s/*
David J. Wool, Esq.
1001 Bannock Street, #410
Denver, CO 80204

Attorneys for Plaintiffs