IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT KOLLER, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>MONSANTO COMPANY, et al.,<br><br>　　　　Defendants. | Case No. 22-cv-04260-MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS; GRANTING IN PART AND DENYING IN PART BAYER AND MONSANTO'S MOTION TO STRIKE** |

　　　　Before the Court are the following motions, each filed April 21, 2023: (1) defendants Bayer CropScience LP ("Bayer") and Monsanto Company's ("Monsanto") "Motion to Dismiss Plaintiffs' Amended Complaint"; (2) Bayer and Monsanto's "Motion to Strike the Declaration of Dr. Charles Jameson"; and (3) defendant The Scotts Company LLC's "Motion to Dismiss Plaintiffs' Amended Complaint."  The motions have been fully briefed.  Having read and considered the papers filed in support of and in opposition to the motions, the Court rules as follows.[1]

## BACKGROUND

　　　　In the operative complaint, the First Amended Class Action Complaint ("FAC"), plaintiffs Scott Koller, Tim Ferguson, Ruby Cornejo, and John Lysek allege they each purchased a "concentrated form[ ] of Roundup, i.e., a Roundup product that "consist[s] of more than 40% glyphosate in sizes at or below 6.8 lbs (the 'Products')" (see FAC ¶¶ 3, 350, 356, 362, 369), which Products are "designed to kill weeds" (see FAC ¶ 2).  Plaintiffs allege that Bayer and Monsanto, as well as defendant Seamless Control LLC

---

[1] By prior order, the Court took the matters under submission.

("Seamless"),[2] "manufacture," "sell," "market," and, through third-parties, "distribute" the Products, and that Scotts "sell[s]," "distribute[s]," and "market[s]" some of the Products. (See FAC ¶¶ 37, 48, 62, 84.)

Plaintiffs allege that "N-Nitrosoglyphosate ('NNG') is an impurity inherent to glyphosate" (see FAC ¶ 4), "the active ingredient of the Products" (see FAC ¶ 139), and that "glyphosate degrades into NNG" when "glyphosate reacts with nitrites, which are prevalent in everyday environments such as city air, exhaust from cars, and water" (see FAC ¶ 6). Plaintiffs also allege that "NNG belongs to a class of chemicals called nitrosamines" (see FAC ¶ 5), that the Environmental Protection Agency ("EPA") "presumes" nitrosamines "to be carcinogenic when they occur at certain levels" (see FAC ¶ 5) (emphasis omitted), and that the EPA "sets a hard limit of 1 part per million ('ppm') of NNG in pesticides, including glyphosate products" (see FAC ¶ 6). Plaintiffs further allege that defendants "sold the Products or caused the Products to be sold to consumers, even though they knew or should have known at the time of those sales that the Products were defective because the Products could never guarantee they would stay below the 1 ppm safety limit for NNG through the time a consumer uses the entirety of the Product." (See FAC ¶ 18.) According to plaintiffs, "ordinary use consistent with the label makes it substantially certain that NNG will form above 1 ppm before the Product is fully used." (See FAC ¶ 321.)

Plaintiffs allege that each plaintiff read the label on the Product he or she purchased and believed the Product was "chemically identical" to "a registered, EPA-approved herbicide," but, unbeknownst to each plaintiff, the Product had "a different chemical composition that enable[d] [it] to develop NNG far in excess of the 1 ppm legal limit," which different composition was "never approved or registered [with]" the EPA.

---

[2] Seamless has not appeared. In their motion to dismiss, Bayer and Monsanto state Monsanto and Seamless have merged, that Seamless no longer exists as a separate entity, and that the arguments in their motion to dismiss apply to Monsanto in its capacity as the successor to Seamless.

(See FAC ¶¶ 351, 358, 364, 371.) Additionally, plaintiffs allege, each plaintiff believed, given the lack of an expiration date on the Product, "it could be used for an indefinite duration when used and stored in accordance with the label," but, unbeknownst to each plaintiff, the Product "[did] not last for an indefinite period" and could be "used only for a limited period of time, if at all." (See FAC ¶¶ 352, 359, 365, 372.) Lastly, plaintiffs allege that each plaintiff was unaware that the Product "was substantially certain to develop uncontrollable and unlawful levels of a probable carcinogen, even with use and storage consistent with the label," there being no "point-of-sale warnings or advertisements disclosing [any of the above]." (See FAC ¶¶ 353-354, 360-361, 366-367, 373-374.)

Based on said allegations, plaintiffs assert, on their own behalf and on behalf of a putative class, eleven Causes of Action, titled, respectively, "Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.," "Violation of the Song-Beverly Consumer Warranty Act for Breach of Express Warranties, Cal. Civ. Code §§ 1791.2 & 1793.2(d)," "Violation of the Song-Beverly Warranty Act for Breach of Implied Warranty of Merchantability, Cal. Civ. Code §§ 1791.1 and 1792," "Breach of Implied Warranty, Cal. Com. Code § 2314," "Breach of Express Warranty, Cal. Com. Code § 2313," "Fraudulent Concealment," "Common Law Fraud, Deceit and/or Misrepresentation," "Violations of the Consumer Legal Remedies Act, Cal. Civil Code § 1750, et seq," "False Advertising, Business and Professions Code § 17500, et seq.," "Unlawful, unfair, and fraudulent trade practices [in] violation of Business and Professions Code § 17200, et seq.," and "Unjust Enrichment."

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss," however, "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," see Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

## DISCUSSION

By order filed February 10, 2023, the Court granted defendants' motions to dismiss the initial complaint. As set forth on the record at the hearing on those motions, the Court dismissed plaintiffs' initial pleading for failure to sufficiently allege NNG is carcinogenic at any level and for failure to sufficiently allege the Products they purchased are substantially certain to develop NNG at a level above 1 ppm, a limit plaintiffs alleged had been set by the EPA. By the same order, the Court afforded plaintiffs leave to amend, which they subsequently did.

In their motion to dismiss the FAC, Bayer and Monsanto argue that the deficiencies previously identified by the Court have not been cured in the FAC; Scotts, in its separate motion, has joined in those arguments.

**A. Carcinogenicity of NNG**

In their initial complaint, plaintiffs, with regard to the question of whether NNG is carcinogenic, relied on a notice filed by the EPA in the Federal Register in June 1980, in

4

which the EPA stated that, as of that time, eighty nitrosamines had been tested for carcinogenicity and, of those, eighty percent were found to be carcinogenic. See 45 Fed. Reg. 42854, 42855 (June 25, 1980). Plaintiffs alleged that in said notice, and "in light of" the above-referenced statistic, the EPA had "adopted" a "process" whereby it would "presume[ ] nitrosamines are carcinogenic" if the level of nitrosamines was more than 1 ppm, "unless the manufacturer provide[d] acceptable oncogenic testing proving otherwise." (See Compl. ¶¶ 73-75.) The Court found plaintiffs' allegations insufficient, the EPA notice being titled a "Proposed Policy" that had been submitted for public comment and there being no allegation the proposal had ever been adopted by the EPA. The Court also found plaintiffs' allegation that most of the tested nitrosamines were determined to be carcinogenic was not, in the absence of other allegations, sufficient to support a finding that NNG itself was carcinogenic.

In the FAC, plaintiffs have added allegations regarding the EPA's proposed process, as well as other allegations pertinent to the question of whether NNG is carcinogenic.

First, as to the policy the EPA proposed in its 1980 notice, although plaintiffs do not allege the EPA has formally adopted it, plaintiffs allege that, since the time the notice issued, the EPA "has repeatedly acted in accordance" with the policy it had proposed (see FAC ¶ 147), and have included factual allegations to support a finding that the 1980 proposed policy has become, in essence, a de facto policy (see FAC ¶¶ 145, 150-151).

The policy, however, does not itself state NNG is carcinogenic. To make that showing, plaintiffs now include several new allegations. In particular, plaintiffs have added factual allegations about nitrosamine testing reviewed by the EPA (see FAC ¶¶ 110-111) and findings made by other agencies about nitrosamines (see, e.g., FAC ¶ 116 (alleging Food and Drug Administration, based on findings made by World Health Organization, has described "nitrosamine impurities" as "probable human carcinogens"). In addition, specific to NNG, plaintiffs now allege that, in 2010, "Monsanto's Crop Protection Manufacturing Lead" stated NNG was a "known" carcinogen (see FAC ¶ 123),

5

and that Charles Jameson, Ph.D. ("Jameson"), a "chemist and environmental toxicologist who specializes in cancer," has "examined available evidence and concluded that NNG is more likely than not carcinogenic"[3] (see FAC ¶ 129; see also FAC ¶¶ 130-131 (setting forth evidence on which Jameson relied in reaching opinion)).[4]

Having considered all of the allegations set forth above, the Court finds, as to the question of whether NNG is carcinogenic, plaintiffs have alleged sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." See Twombly, 550 U.S. at 570; see also id. at 555 (holding complaint need not include "detailed factual allegations" to defeat motion to dismiss, as long as allegations are "enough to raise a right to relief above the speculative level").

**B.  Carcinogenicity of the Products**

The next issue presented is what amount of NNG needs to be present before it can be considered carcinogenic and whether any such amount is present in the Products.

At the hearing conducted on the motions to dismiss the initial complaint, plaintiffs explained their allegations in that regard:  "[W]hat we're saying is that nitrosamine content, NNG content, over one part per million makes the product unreasonably

---

[3] Bayer and Monsanto have moved to strike a declaration attached to the FAC, in which Jameson sets forth his opinion.  To the extent the motion seeks to strike the declaration, the motion is hereby GRANTED.  See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (holding "[m]ost district courts within the circuit have concluded that it is inappropriate to consider an expert affidavit [attached to the complaint] on a motion to dismiss under Rule 12(b)(6)").  To the extent the motion seeks to strike the allegations in the FAC that set forth Jameson's opinion, however, the motion is hereby DENIED.  See Nyugen v. Simpson Strong-Tie Co., 2020 WL 5232563, at *5 (N.D. Cal. September 2, 2020) (striking expert declaration attached to complaint, but declining to strike allegations in complaint "derived" from declaration).

[4] Bayer and Monsanto request the Court take judicial notice of a report prepared by Monsanto scientists that analyzed the results of the study on which Jameson relied and in which those Monsanto employees concluded the study did not show NNG was carcinogenic.  (See Rosenthal Decl. Ex. V.)  As plaintiffs do not rely on or cite to the report offered by defendants, however, the Court denies defendants' request.  See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (holding court, on motion to dismiss, may consider document to which "the plaintiff refers extensively" or which "forms the basis of the plaintiff's claim").

dangerous." (See Transcript of Proceedings, February 10, 2023, 71:5-7.) The Court found plaintiffs' allegations in the initial complaint were insufficient to support a finding to that effect, and, as discussed below, the Court finds the allegations in the FAC likewise are insufficient to support such a finding.[5]

At the outset, plaintiffs characterize 1 ppm as a "safety limit" (see FAC ¶ 18), thus suggesting any amount over 1 ppm would be carcinogenic. Nothing in the 1980 notice, however, states that, in proposing a 1 ppm point of demarcation, the EPA had determined nitrosamines in excess of 1 ppm are unsafe. Rather, the EPA, noting its limited resources, see id. at 42855,[6] and that it is authorized by law to require registrants/applicants to provide the data it needs, see id., proposed, with respect to products that form nitrosamines, placing the initial burden on registrants/applicants to show a lack of unreasonable adverse effects, and selected a 1 ppm threshold as "a practical level of detection for all types of [nitrosamines]," see id. at 42856.

Moreover, even assuming, arguendo, NNG in any amount in excess of 1 ppm would be carcinogenic and thus pose an unreasonable safety hazard, plaintiffs' claims remain deficient, in that, as defendants point out, the FAC is devoid of any allegation that

---

[5] Plaintiffs argue Monsanto is judicially estopped from asserting NNG in excess of 1 ppm does not present an unreasonable safety hazard, for the asserted reason that Judge Vince Chhabria, the district judge conducting a multi-district litigation in which the plaintiffs therein have alleged personal injury claims based on exposure to glyphosate in Roundup, "bar[red] further discovery into NNG based on [Monsanto's] representation that less than 1 ppm NNG was well within 'EPA safety standards.'" (See Pls.' Opp. at 9:14-16.) Plaintiffs have failed to show judicial estoppel applies, however, as the document on which they rely, a case management statement (see Rosenthal Decl. Ex. Q), includes no statement by Monsanto that NNG over the amount of 1 ppm would pose an unreasonable safety hazard. Moreover, plaintiffs have not submitted the above-referenced discovery order, much less shown it was based on an understanding that Monsanto was conceding NNG in an amount over 1 ppm would pose an unreasonable safety hazard. See Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC, 816 F.3d 1208, 1213 (9th Cir. 2016) (holding courts "restrict [ ] the application of judicial estoppel to cases where the court relies on, or accepted, the party's previous inconsistent position") (internal quotation and citation omitted).

[6] In the Notice, the EPA stated it was "currently reviewing some 40 compounds under [a] process to weigh risks and benefits," a "time and resource intensive" process, and that "[o]bviously, not all chemicals can be reviewed at once or in the same time frame." See id.

the Products purchased by plaintiffs exhibited the claimed defect, i.e., an allegation that those Products, or any of them, have formed NNG in excess of 1 ppm, or, alternatively, any allegation sufficient to support a finding that such transformation is substantially certain to occur.  In the absence of a showing that the Products are substantially certain to form NNG in an amount in excess of 1 ppm, plaintiffs' claims fail.  As set forth below, plaintiffs' arguments to the contrary are not persuasive.

As to their breach of implied warranty claims, plaintiffs acknowledge that, where a defect has not manifested, they must establish the defect is "substantially certain to result in malfunction during the useful life of the product," see Hicks v. Kaufman & Broad Home Corp., 89 Cal. App. 4th 908, 918 (2001), and, contrary to plaintiffs' argument, the same requirement applies to plaintiffs' claims for breach of express warranty as well (see FAC ¶¶ 421-424, 442-448, 480-486); Hicks, 89 Cal. App. 4th at 918, 923 (applying substantial certainty requirement to both express and implied warranty claims).

Plaintiffs' remaining claims, namely, that defendants falsely represented/omitted material facts to consumers as to the Products' NNG content (see FAC ¶¶ 491-502, 507-510, 522-529, 540-542, 553, 555-558, 560, 580), and violated state and federal pesticide statutes/regulations because the Products' NNG content assertedly exceeds the authorized amount (see FAC ¶¶ 553-554, 580), are, again contrary to plaintiffs' arguments, subject to the same requirement.  To state a claim based on a false statement or omission, a plaintiff must allege, inter alia, "a misrepresentation of a material fact," see Collins v. eMachines, Inc., 202 Cal. App. 4th 249, 259 (2011), i.e., a "material statement of fact [that] is contradicted by true facts," see In re Cooper Securities Litig., 691 F. Supp. 2d 1105, 1115 (S.D. Cal. 2010).  Similarly, to state a statutory violation based on the sale of a product not in conformity with the license issued, a plaintiff must allege such discrepancy actually exists.  See, e.g., Cal. Food & Agric. Code § 12882(c) (providing pesticide is "misbranded" where "contents of the package are of a quality below that" set forth in "the application for registration").  Consequently, to establish the asserted actuality, i.e., the true facts, plaintiffs must allege the Products they purchased

either formed, or at least are substantially likely to form, NNG in some amount in excess of 1 ppm.

The Court next turns to the question of whether the FAC sufficiently alleges the asserted safety hazard/defect in plaintiffs' Products either has manifested or is substantially certain to manifest.  In that regard, the Court first notes that, although the Products have been on the market since 1999 (see FAC ¶ 184), a period of time in excess of twenty years, plaintiffs do not allege that any Product purchased by any consumer has ever formed NNG in excess of 1 ppm.

Nevertheless, assuming, arguendo, a plaintiff basing a claim on a product of the type here at issue need not necessarily rely on a "history of the products failing," see Hicks, 89 Cal. App. 4th at 922-23 (distinguishing, for purposes of determining whether product failure need be shown, products having "limited useful life," such as motor vehicles, from products having "indefinite" useful life, such as building foundations), he/she nonetheless does need to make the requisite showing of substantial certainty in some manner, see id. at 923 (finding sufficient showing made where plaintiffs "presented expert testimony based on observations and analysis").

Here, plaintiffs rely on the results of a study Monsanto conducted in 2004, which results, plaintiffs allege, show NNG is substantially certain to form in the Products.  In that regard, plaintiffs allege, the sample used in "Test 9," one of the tests conducted therein, "best approximates the Products themselves."  (See FAC ¶ 244.)  Plaintiffs further allege that, in Test 9, the samples were exposed to nitrites either for "6 minutes per day" over "3 days," for a total of "18 . . . minutes of exposure time," or, alternatively, for "6 minutes per day" over "6 days," for a total of "36 minutes" (see FAC ¶ 237 (emphases omitted)), and that a consumer using a Product is "substantially certain to exceed 18 minutes" in performing tasks that expose the Product to nitrites, such as "open[ing]" a Product to use it and "mix[ing] in the water" (see FAC ¶ 246).

As defendants point out, however, the 2004 study states that the samples were placed in "humidity chambers" that were "connected . . . by piping to nitrogen dioxide in

air cylinder[s]" (see Rosenthal Decl. Ex. N at 12),[7] and that nothing in the study states that samples were exposed to nitrites for only six minutes per day. Rather, the study explains that the nitrites in the air cylinders were to be piped into the chambers containing the samples, which piping took six minutes to complete (see Ex. N at 12, 18, 23), and that, once the chambers were filled with the nitrites, the samples were continuously exposed to them for either three days or six days. (See Ex. N at 18 (stating, with respect to Test 6, "[t]he samples were exposed to 5 ppm [nitrites] for 3 and 6 days); id. Ex. N at 23 (stating Test 9 was "a repeat of Test 6" with the exception that 1ppm of nitrites was placed in each chamber).)

Plaintiffs do not allege that their Products, or those of other consumers in the putative class, would be exposed to nitrites continuously for three or six days. Consequently, even assuming the samples that were the subject of Test 9 were the equivalent of the Products, the results do not show the Products – as actually used by consumers – are substantially certain to form NNG in excess of 1 ppm. See Gulf South Insulation v. United States Consumer Product Safety Comm'n, 701 F.2d 1137, 1145 (5th Cir. 1983) (finding, as to insulation product, studies "inadequate to serve as a database for . . . risk assessment" where studies did not "reflect[ ] conditions similar to . . . an average home").

Plaintiffs seek to avoid this conclusion by arguing that the Court cannot consider the contents of the study to the extent the study contradicts plaintiffs' allegations. The Court disagrees. Although a court may not, on a motion to dismiss, consider for its truth the contents of an incorporated document where the facts stated therein are disputed by "facts stated in a well-pleaded complaint," see Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1003 (9th Cir. 2018); see also, e.g., Sgro v. Danone Waters of North America, Inc., 532 F.3d 940, 942 and n.1 (9th Cir. 2008) (holding where plaintiff alleged "[disability]

---

[7] The Court grants Bayer and Monsanto's request that the Court take judicial notice of the 2004 study, as said document is expressly referenced in the FAC and plaintiffs rely on its contents. (See, e.g., FAC ¶¶ 218-221.)

plan documents d[id] not accurately reflect the plan as implemented," court could not, on motion to dismiss, find plan documents accurately reflected how plan had been implemented), where a "complaint makes conclusory allegations that are contradicted by documents referred to or incorporated in the complaint, a court may decline to accept such conclusory allegations as true," see J.K.J. v. City of San Diego, 17 F.4th 1247, 1254 (9th Cir. 2021) (internal quotation, alteration, and citation omitted).  Here, plaintiffs do not allege the study misrepresents or misstates how the tests were conducted; rather, plaintiffs have not accurately described the content of the study on which they rely.

Accordingly, for all of the reasons set forth above, plaintiffs have failed to sufficiently allege that the Products they purchased are substantially certain to form NNG in excess of 1 ppm, and, consequently, each of their claims fails.

## C. Further Leave to Amend

In their opposition, plaintiffs request further leave to amend in the event the Court finds they have again failed to a state a cognizable claim.  As plaintiffs fail, however, to identify additional facts they could allege to state such a claim, further leave to amend will be denied.  See Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1052 (9th Cir. 2008) (holding leave to amend properly denied, where plaintiffs "fail[ ] to state what additional facts they would plead if given leave to amend").

## CONCLUSION

For the reasons stated above, defendants' motions to dismiss are hereby GRANTED, and the First Amended Class Action Complaint is hereby DISMISSED without further leave to amend.

**IT IS SO ORDERED.**

Dated: December 4, 2023

MAXINE M. CHESNEY
United States District Judge